UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| STACI L. DELON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:12-cv-0556-JMS-MJD |
| | ) | |
| ELI LILLY AND COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF STACI DELON

Now comes Staci DeLon and makes the following declaration:

1.  My name is Staci DeLon.  I am the plaintiff in this case.  I make this declaration based upon personal knowledge, and I am competent to testify to the matters stated herein.

2.  I was hired by Eli Lilly in August, 2001 right after I graduated from Purdue University.  The first position I had with Lilly was pharmacokinetics operations associate.  In this role, I worked closely with Lilly pharmacokineticists, research scientists who work on issues relating to drug dosages.

3.  In 2004, I transferred to the position of scientific communications associate.  As a scientific communications associate, my primary responsibilities were to write regulatory documents and disclosures, prepare and manage regulatory documents for global registration, and participate in alliance management and process improvement.  This work involved writing protocols for studies, final study reports, annual reports, investigators' brochures and journal manuscripts.

4.  In approximately 2006, I was promoted to the position of senior scientific communications associate.  The core responsibilities for this position were the same as those for

1



the scientific communications associate but at a higher level, and the position also involved more leadership responsibilities.

5.     Throughout my employment with Lilly my performance qualified me for merit increases.  I believe that I received a merit increase each year of my employment, and I am certain that my performance in 2009 qualified me for a merit increase in 2010.

6.     Beginning in the years prior to 2007, I had a number of health problems. Among other conditions, I had several broken bones, I had developed kidney stones, I suffered from gall stones, I had a hysterectomy, I suffered from migraine headaches and extremely severe acid reflux, and I had major depressive disorder, chronic nausea and irritable bowel syndrome. Finally, in 2007, I was diagnosed with Cushings syndrome.   This disease involves overproduction of the hormone cortisol by the adrenal gland.  In my case, it was caused by a tumor on one of my adrenal glands.  The Cushings syndrome was the cause of many of my other health problems.

7.     After the Cushings syndrome diagnosis in 2007, I had dual surgeries:  an adrenalectomy to remove the adrenal gland with the tumor and a Nissen fundoplication which is a surgical procedure to reinforce the closing function of the lower esophageal sphincter to reduce acid reflux.

8.     The adrenalectomy stopped the overproduction of cortisol, but my other adrenal gland had gone dormant and was not producing any cortisol so after the surgery my condition changed from one in which I was suffering from an overproduction of cortisol to one of adrenal insufficiency.   The adrenal insufficiency left me without any energy, and I had difficulty staying awake. I was prescribed with a low dose of cortisol, and I am still taking a cortisol enhancement because my adrenal gland is still not producing a sufficient amount of cortisol.  Even with the

supplement, I continue to suffer from adrenal insufficiency, and I have very low energy which makes it difficult for me to stay awake, particularly in the morning.

9.     The surgeries did not cure the damage that had been caused by the overproduction of cortisol.  I continued to suffer from major depressive disorder, severe chronic nausea, IBS, osteoarthritis, osteoporosis, fibromyalgia, interstitial cystitis, hypothyroid, migraines, small bowel adhesions, memory impairment, and major food allergies.  In addition, after the 2007 surgical procedures, I now suffered from adrenal insufficiency which caused chronic fatigue. And because the Nissen fundoplication restricted my lower esophageal sphincter, my chronic nausea resulted in frequent bouts of dry heaves.

10.     My illnesses made it very difficult for me to report to work at my work station in Lilly's Indianapolis corporate office on a daily basis.  I live north of Kokomo, and it takes approximately one and one half hours to drive between my house and Lilly's Indianapolis offices.   Beginning in 2006 or 2007, my chronic nausea, chronic fatigue, gastrointestinal problems related to IBS and my food allergies and the medications I take to treat these conditions interfered with both my ability to  commute to Indianapolis on a daily basis and my ability to work a normal eight hour shift at Lilly's offices.

11.     The adrenal deficiency left me extremely fatigued and made it extremely difficult for me to get up early in the morning.  The fatigue also interfered with my driving and required me to rest periodically throughout the day, something I could conveniently do at home but not at the office.     In addition, medications that I was taking, particularly Marinol which had been prescribed for my chronic nausea, had a side effect of making me dizzy, and this dizziness also interfered with my ability to drive and also my ability to function within the office without periodic rest breaks.  The driving and daily functioning within the office was further complicated

by the fact that one of the symptoms of my gastrointestinal problems related to IBS and food allergies is that I have frequent, severe diarrhea.  During the one and one half hour commute, I was at risk of being unable to control my bowels and having diarrhea while in the car.  And while at work, I was required to make frequent, emergency trips to the bathroom which was both inconvenient and embarrassing.   Commuting to work every day and working in the office every day with these symptoms was not possible because forcing myself to work from the Lilly offices five days each week created stress which aggravated my conditions and made me ill to the point of incapacity.

12.    Beginning in 2006 or 2007, I worked with my supervisors to arrange an accommodation which permitted me to work from home three days each week and use Lilly's flex time policy to take every other Friday off.  Under this schedule, I was able to reduce the number of days that I had to work from the Lilly office to two days one week and one day the next.   I successfully worked with this work schedule under three different supervisors until the end of 2009.

13.    As I was in complete control of my schedule at home, I could rest when necessary.   I could then work into the evening to complete the required tasks, working throughout the day when I felt the most productive.  I was able to concentrate on my work at home better than I could at the office.  This increased concentration made me more productive with respect to my writing responsibilities which were the major part of my job.  My job required me to communicate with other Lilly employees, but many of them worked from locations outside Indiana and outside the United States so I communicated with them by phone and email just as I communicated with them when I was at Lilly's Indianapolis corporate office.  Through phone calls, emails and face to face contacts with Indianapolis employees on the days that I worked in

4

the office, I was able to effectively perform all my job responsibilities. In fact, I was able to more effectively perform my job responsibilities under this schedule than when working in the office five days each week because working from home several days each week was much less stressful than working in the office every day. By restricting in-office work to one or two days each week, I remained physically and psychologically healthier and more productive than if I had to commute and work in the office five days each week.

14.    I was not the only Lilly employee who worked from home. Lilly had a telecommute program under which employees were able to work from home even more than I did. I worked directly with Susie Chang between 2007 or 2008 and the end of 2009 when Lilly forced me to take disability leave. During that period and up to my termination in June, 2010, Ms. Chang resided in Lafayette, and she was permitted to work from home, only occasionally coming into the office.

15.    In 2009, my immediate supervisor was Charlene Jones. Ms. Jones was very supportive of my working from home. She told me that she believed that working from home promoted the quality of my work, and she gave me an evaluation in 2009 which qualified me for a merit increase in 2010. A copy of the 2009 evaluation is attached to this Declaration as Exhibit 1.

16.    In late September, 2009, I learned that there was a question as to whether I would be permitted to continue working from home several days each week. Lilly decided to eliminate its flex policy effective January 1, 2010. It did not, however, eliminate its telecommute policy. Both Ms. Jones and I wanted me to continue working from home, and she recommended that with the termination of the flex time policy, I explore the telecommuting policy and take the

steps necessary to secure approval of continuing to work from home.   A copy of the Lilly Telecommuting Toolkit is attached as Exhibit 2.

17.   I consulted with my primary physician, Dr. Timothy Gatewood.   He recommended that I work from home four days per week for the next six months.  A copy of Dr. Gatewood's September 28, 2009 letter requesting that I be permitted to work from home four days per week for the next six months is attached to this Declaration as Exhibit 3.

18.   From the beginning of this discussion about my future schedule, Charlene Jones' supervisor, Cathy Drook, was resistant to the idea that I be permitted to continue working from home several days per week, but she did not provide a firm denial.   I continued to discuss my situation with Ms. Jones who remained supportive.  Ms. Jones contacted Dr. Kristine Courtney in Lilly's Employee Health Services and asked for her opinion as to whether my continued working from home should be permitted.  Dr. Courtney then contacted me and told me that the decision would not be made by her but by the business unit.

19.   Throughout October and into November, 2009, I communicated with Ms. Jones and with Hongxia Shi, an employee in Lilly's Human Resources office about my request for accommodation.  In late October, 2009, Ms. Jones told me that the decision was out of her hands and would be made by the Director, Cathy Drook, with input from Employee Health Services (EHS).  Ms. Jones recommended that I have my physician communicate directly with EHS with regard to the reasons that I needed to work from home.  Dr. Gatewood then provided the medical reasons that I needed to work from home four days per week to Dr. Courtney.  A copy of a letter he faxed to Lilly on November 5, 2009 is attached to this Declaration as Exhibit 4.

20.   While the issue was under discussion in October and November, I continued with my schedule of working from home three days each week and taking every other Friday off.  The

uncertainty of whether I would be permitted to continue working from home caused me extreme stress, and I was forced to begin counseling in late October, 2009, with Jeanette Murphy, MA LCSW. Despite the stress, my job performance did not suffer. In November, 2009, Ms. Jones did a Final PM Review of my performance which was very positive. A copy of the Review is attached to this Declaration as Exhibit 5.

21.     In November, 2009, I was informed that I would not be permitted to continue working from home. Ms. Drook made the decision.

22.     With the denial of my request to work from home, Lilly was going to require me to report to work at the Lilly offices in Indianapolis five days each week beginning in January, 2010. Dr. Gatewood's letter dated January 13, 2010 describing my condition is attached as Exhibit 6 and Dr. Douglas K. Rex's report of my condition dated January 20, 2010 is attached as Exhibit 7 and his letter, dated January 22, 2010, that he sent to Lilly is attached as Exhibit 8. My physical and psychological disabilities prevented me from being able to work on this basis, so I applied for disability leave under the Lilly Illness Pay Plan. The leave was granted.

23.     From January through June 22, 2010, I was on short term disability under Lilly's Illness Pay Plan. I was required to stay in close contact with Kathy Britton a nurse case manager in Lilly's Employee Health Services department and provide information about my physical and psychological condition as required.

24.     After I went on disability leave, my psychological condition deteriorated because my work was very important to me and being denied the opportunity to continue working undermined my sense of self worth and exacerbated my depression. The EHS department arranged for me to see Dr. Robert Blake at United Behavioral Health. I discussed with him the fact that my depression had gotten worse because Lilly would not permit me to continue working

7

from home.  Dr. Blake recommended that I continue with counseling and consider in patient treatment.  He also recommended that I attempt to arrange a reasonable accommodation with Lilly under which Lilly would reinstate the work schedule that had permitted me to work from home several days each week.   The report that Dr. Blake sent to Lilly is attached as Exhibit 9.  Although Lilly had arranged for the assessment and Dr. Blake stated that I should be accommodated with a schedule that permitted me to work from home, Lilly did not offer me the opportunity to work from home.

25.    Because of the aggravation of my depression, I was admitted to the Trinity House St. Joseph Hospital's Partial Hospitalization Program from early February until early March, 2010.  After my release, I continued outpatient treatment which involved intensive outpatient meetings three days each week from 8:30 a.m. to 11:30 a.m. through March, 2010, and then two days each week through April.

26.    Based on information provided by my physicians, Lilly extended my disability leave several times.  In May, my leave was scheduled to expire May 17, but I knew that I could not return to work if I was going to be required to report to the Lilly offices in Indianapolis five days each week.  In mid-May, I called my immediate supervisor Charlene Jones to see if I could arrange a work schedule that would permit me to work from home several days each week.  Once again, Ms. Jones expressed support for my request and told me that she would check with the appropriate individuals within Lilly to see if this arrangement could now be made.  Despite Ms. Jones' support of my request, Lilly would not agree to permit me to work from home several days each week.

27.    Lilly did extend the expiration of my leave into June.  But it was apparent to my doctors and me that if I was going to be required to work from Lilly's offices in Indianapolis five

8

days per week, I would be unable to return to work in June. On May 27, 2010, Dr. Gatewood faxed a letter to Lilly describing my physical and psychological condition together with a medical report. In the letter he stated, "[D]ue to these ongoing issues, treatment, and medications with multiple side effects, the patient will be unable to work through September of 2010." A copy of Dr. Gatewood's letter and report is attached to this Declaration as Exhibit 10. In addition, Dr. Michelle Haendiges, a gynecologist who was treating me for hormone imbalance faxed a letter to Lilly on June 14, 2010 in which she described the treatment she was providing and stated, "Due to the ongoing issues, treatment and adjustments to her medications she will be unable to work through August 16, 2010." A copy of Dr. Haendiges June 14, 2010 letter is attached to this Declaration as Exhibit 11.

28.     Despite my doctors' letters stating that I could not return to work in June, I was informed by Kathy Britton that I must return to work by June 17, 2010 because further illness pay was not supported. I then received a letter from Jeannette Colonna, dated June 16, 2010, which confirmed that I was being required to return to work on June 17, 2010. The letter is attached as Exhibit 12. An appointment with Dr. Twenty in Lilly's Employee Health Services was arranged to see if Dr. Twenty would clear me for a return to work. I met with Dr. Twenty on June 17, 2010. Dr. Twenty did not perform any examination of me. He simply looked at a list of the medications I was taking. I used the meeting as an opportunity to explain why I was unable to return to work. Dr. Twenty told me that the information that had been submitted would not support further illness pay. He did say that I could take the rest of the week off and report the following Monday.

29.     In June, 2010, I was communicating with both Kathy Britton and Jeannette Colonna, another Lilly representative in the Human Resources Department, about Lilly's

9

decision to require me to return to work.  Ever since my employment with Lilly, I had been paying for a supplemental Extended Disability Leave benefit through payroll checkoff.  I could not understand why, when I had two doctors who said I could not return to work and I had paid for Extended Disability Leave benefits, I was not going to be permitted to stay off work with Extended Disability Leave benefits.  I had a conversation with either Ms. Britton or Ms. Colonna about this issue, I do not recall which one, and I asked why I could not continue my leave with EDL benefits that I had paid for.  I was told that I could not apply for EDL benefits because I had not completed the duration of the illness pay benefits that I had been receiving, and I was not eligible for EDL.  The information concerning the EDL plan that I found on the Lilly internet is attached as Exhibit 13.

30.    On June 22, 2010, I received a letter from Ms. Colonna which stated that if I did not report for work at Lilly by noon, I would be considered to have voluntarily resigned my employment.  A copy of Ms. Colonna's June 21 letter which I received on June 22, 2010 is attached to this Declaration as Exhibit 14.  I then immediately responded to Ms. Colonna with an email in which I stated that I was not voluntarily resigning my employment but that due to my medical conditions which had been clearly defined by my doctors, I was unable to return to work at this time.  A copy of my email to Ms. Colonna is attached to this Declaration as Exhibit 15.  I was unable to return to work on June 22, 2010, under a schedule which required me to work from Lilly's Indianapolis offices five days each week.  By letter of June 25, 2010, Lilly formally terminated my employment effective June 22, 2010.  A copy of the letter is attached as Exhibit 16.

31.     In June, 2010, I was clearly unable to return to my job with Lilly if, as Lilly was requiring, the job involved working on-site at Lilly's offices five days per week.  If, as I requested in the fall of 2009 and May, 2010, Lilly had permitted me to work from home several days per week, I believe that I would have been able to return to work in June with that schedule. My psychological condition had deteriorated after Lilly refused to permit me to continue working from home after December, 2009, but the deterioration was caused by my inability to continue working so I believe that my depression would have improved if Lilly had permitted me to return to work in June, 2010, with a schedule that permitted me to work from home.

32.     I know that Lilly is contending in its Brief in Support of Summary Judgment that I stated in my deposition that I would have been unable to work in June, 2010 even if I had been permitted to work from home several days per week.   My response is that I do not believe that I was ever asked whether I would have been able to work in June, 2010, if I had been permitted to work from home several days per week.  In addition, at the deposition, I had forgotten about my conversation with Charlene Jones on May 14, 2010, in which I specifically requested a schedule in connection with my return to work that would permit me to work from home two to three days per week.  I did not recall this conversation until I saw the document that Lilly produced with the Bates number LLY-DELON0001219, and I did not see that document until after my deposition. A copy of this document is attached as Exhibit 17.  I believe that in May, 2010, I had a better awareness and understanding of whether I could work from home in June, 2010, than I did nearly three years later in February, 2013 when I gave my deposition.

I declare under the penalties of perjury that the foregoing statements are true and correct.

Executed this 4th day of September, 2013.

_____

Staci L. DeLon

# Performance Management

**2009**

| Name: Staci De Lon | Org Unit: GIS GMC Pre-POC | Position: Sr Associate-Scientific Comm |
|---|---|---|
| Global ID: 133202 | Pay Grade: P2 | PM Supervisor: Charlene Jones |

## PERFORMANCE SUMMARY

(completed by supervisor for interim and final review)

**Summarize what was completed and how it was accomplished. (Limit 2,000 characters)**
Summarize information about ethics and compliance behaviors associated with the employee's performance.

Ethics and compliance conversation completed with Staci during interim and final PM discussions. Training and CATS compliance has stayed at 100%. Staci has been a solid contributor throughout the year and has done well with the writing and support of Enzastaurin and Semagacestat. BDS for which she has received positive feedback. Staci has supported the MQS redesign project as the clinical practice SME providing feedback on the revised MQS Protocol procedure and the required QR checklist. Staci completed two Duloxetine manuscripts which provided a learning opportunity for her as she has not worked on this type of deliverable before. Staci has embraced the FIPNET directive as she has provided oversight to vendor writers from both the fully outsourced model, IOS, and functionally outsourced writers from our preferred vendors. Staci has worked with the Standards and Templates Advisory Group (STAG) to ensure SKE's for TQI and renal remain updated as a clinpharm tool. Staci has made several informative presentations to the Biopharm group and to our EPM/ Biopharm writers regarding the new clinical practice protocol template and what has changed since the last update. The information was well received with f/u meetings and coaching sessions scheduled. Staci did an effective job mentoring our newest Biopharm writer to success and has made herself available to coach other writers as needed.

**What was not completed or could have been done differently? (Limit 2,000 characters)**
Staci should continue to enhance her writing skill to ensure readability and that documents consistently tell a scientific story for that compound and/or trial. Staci should also continue to concentrate more on the PK sections of her FSRs to ensure that section flows with the other sections of the study reports.

## PERFORMANCE BEHAVIORS

(completed by supervisor for interim and final review)

| | RATING |
|---|---|
| **Engagement:** Commit to the success of our business. Work with passion. Speak with candor and actively share your point of view. Listen openly and seek others' views. Take on challenging assignments. | Successful |
| **Teamwork:** Work as an exceptional team member. Understand the team goal. Understand your individual role and use your strengths and expertise to help the team achieve its goal. Break down barriers that keep the team from achieving its goal. | Successful |
| **Accountability:** Be responsible for your words and actions. Make the decisions that are yours to make. Deliver on commitments and insist that others do the same. | Successful |
| **Action:** Decide and act promptly, using good judgment. Anticipate and remove | |

## BASE PAY INCREASE ELIGIBILITY

(completed by supervisor for final review)

☒ **ELIGIBLE** – Based on performance, which includes adherence to ethics and compliance requirements, this employee will be considered for a base pay increase.

☐ **INELIGIBLE** – Based on performance, which includes adherence to ethics and compliance requirements, this employee is not eligible for a base pay increase.



PENGAD 800-631-6989

DEPOSITION
EXHIBIT
2/26/13 db

EXHIBIT
tabbies
1

obstacles that get in the way of progress. Learn as you go. Change and adapt as necessary.

Values: Demonstrate the Lilly values - Integrity, Excellence, and Respect for People - through daily conduct and adherence to The Red Book, Lilly's Code of Business Conduct.

| | Successful |
|---|---|
| | Successful |

Exemplary - Widely recognized achievement of superior business results and demonstration of effective behaviors
High Successful - Consistent achievement of expected and sometimes superior business results and demonstration of effective behaviors
Successful - Consistent achievement of expected business results and demonstration of effective behaviors
Low Successful - Achievement of some expected business results but needs improvement on some specific behaviors
Unsatisfactory - Did not meet minimum performance standards for job level

02-May-2012  16:30

*Lilly*

## Objectives, Expected Results, and Results

Staci De Lon

| Objective-1 | Corporate Integrity |
|---|---|
| | • Understand and follow all laws, regulations, the Corporate Integrity Agreement (CIA) Consent Decree, The Red Book, and policies relating to my job<br>• Operate in a culture of compliance that maintains the highest standard of ethical behavior and conduct in all we do<br>• Integrate ethics and compliance into daily activities<br>• Understand, explain and support the rationale for ethics and compliance<br>• Respond appropriately to reported, known, or suspected compliance violations |
| Expected Results: | 1. Compliance of laws, regulations, CIA, Red Book, or other policies will ensure that we understand our responsibilities, fulfill them daily, protect and enhance company reputation.<br>2. Cooperation with investigations, monitoring, and audits will allow corrective measures to be employed as needed.<br>3. Completion of training by due dates with no reminders or delinquent notices will maintain 100% training compliance.<br>4. Report known/suspected compliance violations per Red Book will maintain 100% training compliance. |
| Results:<br>(What and How) | 1. **Complied with all the laws/regulations defined by CIA/consent decree, Red Book, & other policies by reading, understanding, & implementing all guidelines therein with due diligence.** IMPACT: Compliance in this area set standards for appropriate work place behavior; ensured personal conduct is consistent w/company legal obligations, global policies, & core values, & that I 'live the Lilly Brand' in my working relationships w/peers, supervisors, customers, TPOs & government agencies.<br>2. Not applicable at this time.<br>3. **Maintained 100% compliance in completing all required ITP training on time without any delinquent notices and will continue doing so for all upcoming training requirements by regularly checking my ITP.** IMPACT: My effectiveness and productivity in job performance are increased when my training is @ 100% because I am up to speed on current standards and practices.  This allows me to contribute more efficiently to my business projects and deliverables, bringing them in on time or early.<br>4. Not applicable at this time. |
| Objective-2 | Deliver the Single Global Portfolio |

Develop and deliver the approved 2009 business plan commitments globally/locally by maximizing outsourcing paradigm through leverage of internal/external collaborations and innovative information strategies while ensuring deliverables are achieved on time, within budget, and with quality.

**Expected Results:**

1. Creation of detailed workplans following SOP reviews/QC will ensure completion of quality deliverables.
2. Completion of deliverables w/in 30 days of forecast 95% of time using approved change control process & relay changes to TL/teammates asap will ensure accurate metrics.
3. >95% SDD docs completed on-time maximizes resourcing
4. Effective use of available sourcing models maximizes resources
5. Effective partnering to support delivery of sci info in all regions will support global portfolio

**Results:**
**(What and How)**

1. My recently approved SMG CHMP BD had a very aggressive timeline. Created detailed workplan, outlined specific tasks, w/due dates for drafts, onlines, peer/mgt reviews, QC, editing, approvals, & publishing. IMPACT: This ensured clear & explicit accountability by following SOP guidelines, gave people authority & autonomy to meet critical due dates & deliver quality documents. Additionally, I continually managed the timeline, organized wkly mtgs for draft reviews, emphasized next steps, & sent email reminders as appropriate. I established reviewers & QC'ers early in the process, notified them of upcoming responsibilities & status changes. IMPACT: This kept my team on track, gave reviewers substantial notice, allowed completion of BD on time w/QSV, and kept us on track for upcoming submission.

2. Created spreadsheets listing doc deliverables w/key due dates, updated as timelines change, relayed this info to mgt & GMC specialists so they could maintain accurate metrics. IMPACT: This allowed mgt to optimize resourcing capacities; ensured all docs were delivered w/QSV, demonstrated personal accountability & commitment to meeting deadlines using approved change control processes.   YTD, this has enabled me to complete several trial/cmpd deliverables.

3. Completed 2 dulox manuscripts (MS) (HMEJ [renal],HMFP [warfarin]) by agreed upon journal submission dates. Both docs required 2-3 revisions/resubmissions; addressing several reviewer comments, revising the MS accordingly, arranging QRts, edits, eDAR review/approv. IMPACT: Since I'd never worked on MS before, this impacted my experience by requiring me to take action, learn I as go, anticipate & remove obstacles so MS could move thru all steps in timely manner, while continually increasing quality of final MS & still meet our deadline. One of the 3rd round HMEJ reviewers challenged that the authors had attempted to expand the use/indication of dulox in renal patients. Due to the significance of such a statement, we needed formal legal input, which meant we had to ask for an extension of the journal due date. Rather than wait to see if the atty would provide feedback in the short time remaining, I contacted the journal & asked for an extension. IMPACT: This afforded the team time to carefully address this reviewer's comment.   The MS was subsequently accepted for publication. The ultimate impact of this publication is that it will help Lilly customers make informed evidence-based therapeutic decisions & build customer trust.

4. Implemented a variety of OS models to ensure my cmpds progress toward submission. The SMG team employs BIOS model for the majority its deliverables. Drafted & delivered several PSDs; provided constant oversight to Covance MWs in protocol/CSR writing & doc admin; provided same type of OS to I3, Kendle, & inVentiv MWs for similar deliverables. IMPACT: Collectively, this oversight has allowed me to manage several more deliverables than I would otherwise be able to manage and allowed Lilly to take advantage of external collaborations to drive efficiency and ultimately serve to reduce drug to market cycle time, thus improving QSV.

5. Effectively partnered w/CDAs to complete Chinese LFBG PK protocol (SMG). Regulatory req's are significantly

| Objective-3 | Connect to Our Vision |
| --- | --- |
| | Inspire myself and others by living the Lilly values; focusing on delivery of results & outcomes and partnering with my supervisor to develop my skills & own my career and contributing to the development of others in sharing of technical knowledge though coaching and constructive feedback. |
| Expected Results: | 1. Alignment of objectives with those of the global business; align behaviors to reflect Lilly's brand; the PMR w/focus on patient safety/customer/business impact<br>2. Exhibit leadership/accountability to meet GMC's goals will ensure deliverables with QSV<br>3. Accountability for actions in managing difficult issues/clarity about authority of team deliverables<br>4. Recognize others/engage in coaching/feedback will encourage others to perform at their best<br>5. Seek understanding to implement func'l changes |
| Results:<br>(What and How) | 1. **Directed the publisher how to re-organize appendices of an older, ENZ CSR into new granularized format by determining which app's fit into new structure & how to address remaining app's that suddenly had no 'home'.** IMPACT: My guidance will facilitate a smooth registration submission by aligning docs in a format that is consistent with the eCTD & global business standards now, so that when submission time comes, the CSRs will already be in a format that is consistent with the eCTD. |
| | 2. **a. Gave presentation at biopharm F2F mtg re: changes to CP protocol template since the last template update.** IMPACT: Presentation was well received & provided clarification of significant revisions to protocol development follows ICH guidelines, progresses efficiently, adheres to approved structure/req'd template text, and ensures we meet GMC's goals of delivering docs w/QSV. **b. As a member of Standards & Templates Advisory Group (STAG), continued my leadership responsibilities by ensuring we have working group members for TQT and renal scientific key elements (SKE), set up a kick-off meetings, & gave presentations to educate groups of need for updates & their roles/ responsibilities in update process.** IMPACT: SKEs are important clinpharm tools because they provide guidance on writing protocols of same study type w/suggested language & best practices from topic experts, which also serve to meet GMC's goals of delivering documents with QSV. |
| | 3. **During archival of LFAR CSR, I discovered the cover pages of LFAR protocol amendments (b) & (c) had incorrect dates for original protocol & protocol amend (a). As CP protocol template SME, I consulted CP protocol consultant, func'l AOC, SMG Reg Sci & CDA; gained agreement on resolution. Since amend (b) hadn't been implemented, it hadn't been sent to FDA, therefore I was able to unlock & correct its cover page dates; however, amend(c) had already been sent to FDA, so the decision was made not to correct its cover page. I created a NTF, very clearly explaining error & corrective action.** IMPACT: Managed difficult issue w/authority as CP SME, & the impact of my accountability in this situation is that I ensured the team's maintenance of accurate cmpd files for audit/submission purposes, & facilitated team accountability for our actions & deliverables. |
| | 4. **a. Gave Spotlight award to my dulox pub coordinator to thank her for all her advice, guidance, & support as I worked my way through my 1st MS submission.** IMPACT: This encouraged & allowed her to leverage strengths in a manner consistent w/collaboration, teamwork, & innovation. **b. Additionally, I am a bph coach for new FTEs in GMC exp/bph functions and hold regularly scheduled coaching mtgs w/new bph writer as well as a curriculum session** |

different from US & EU reg bodies, & required extreme diligence/communication to comply. IMPACT: Thru constant communication & consultation w/func'l & regional experts, drove team to produce quality protocol (PA 17July) to meet Chinese regulations as well as internal portfolio & submission plans.

| | |
|---|---|
| **Objective-4** | **Fix Quality System and Process Management**<br><br>Propose, deliver, support, and implement new productivity initiatives that will support and transform the way that we do business to facilitate speed in products to our customers and drive change. |
| **Expected Results:** | 1. Develop/implement single MQS while maintaining SOP compliance will lead to FIPNET implementation<br>2. Apply Critical Chain concept to deliverables in order to allow for focused work<br>3. Support Six Sigma/GMC strategy projects/change initiatives as applicable to enable effective FIPNET<br>4. Flexible/problem solving by adapting to changing workplans/project assignments to result in QSV<br>5. Focus on productivity and work-life balance will lead to more balanced individual productivity |
| **Results:**<br>**(What and How)** | 1. Participated in MQS redesign as the CP protocol template SME, provided feedback on revised MQS Protocol Dev'ment Procedure & Required Tool OR Checklist, carefully reviewed & provided constructive feedback on content of both docs based on my experience as SME, protocol writer & over-seer of OS'd protocols. IMPACT: This project is leading to a single, integrated medical quality system that will ensure alignment of requirements, doc consistency, & overall quality system gate-keeping.<br><br>2. Implemented CC in Q4'09 after relay race training with our GMC func'l group as a corporate wide strategy to speed the dev'ment of molecules through the pipeline. IMPACT: Working in a focused manner allows me to prioritize and concentrate on 1 task at a time, see it through to completion, pass it off to the next person in the chain, and thus deliver the 'product' into the customer's hands as quickly & reliably as possible.<br><br>3. a. Participated in GMC training review project, by reviewing of all Sci Com/Med Info training mat'ls related to protocol dev'ment. As the CP protocol template SME, reviewed ITP maps, assoc'd BETs, ITA questions, SOPs, policy, process, SOPs tools, job aids, & other training mat'ls for my topic. Required me to be all inclusive in identifying existing mat'ls & gaps related to protocol & to consult other SMEs, staff, training professionals, & affiliate counterparts to align on findings & network training opportunities or lack of materials. IMPACT: Identified training gaps, developed/re-developed GMC toolboxes, ITP, ITA & onboard plans, as well as aligned GMC &USMIS; & provided data needed for MQS redesign & CIA assessment initiatives. b. Involved in move to new Leo authoring system as CP protocol template SME by providing feedback on revisions to the CP protocol template & ensuring compatibility w/new system. IMPACT: Leo will: est' minimum standards for transfer of docs to reg agencies, eliminate draft version storage post-approval, eliminate use of e-mail attachments & manual work-arounds, allow for e-approvals/signatures,  utilize workflow notifications, etc. to plan & drive process steps, ultimately enabling effective FIPNET.<br><br>4. Maintained flexibility & practiced creative problem-solving to complete ENZ TQT BD & submit to FDA. During |

Additional content (above, continuing from previous):

w/all new writers to coach them on protocol development using protocol templates. IMPACT: My coaching fosters confidence in new writers & enables them to perform their role w/proper training & understanding of our processes & expectations. **c. As CP SME, continually provide answers to GMC writers whenever questions arise regarding CP protocol template**. IMPACT: This allows individuals to perform writing responsibilities accurately & efficiently, and allows them to check their understanding of template structure and guidance.

5. **Attended func'l mtgs to learn about & understand implementation of Lilly job re-leveling**. IMPACT: Understanding Lilly's business needs addresses the Lilly Co 2009 objective of building an 'Outcomes-focused' Culture. Job re-leveling allows each employee to give their best (engagement), focus on & achieve company goals (accountability), build teamwork, & make measurable progress in achieving short- & long- term business goals.

drafting, our reg scl & BC left the cmpd, the PK Scl left the company, & the statistician went on maternity leave, leaving me & the CP as the only constants on the BD. In the midst of QC'ing, I found several STATs discrepancies, requiring new analyses, I found a glaring error in the ECG AE listings of one of our published CSRs.  I worked with Stats to QC the updated analysis & with pub to correct the CSR error. IMPACT: Although we had to move the apprv date out considerable, the end result was a very important quality report, which if approved by the FDA, will cut the cost of developing ENZ because we won't have to perform a very expensive & lengthy TQT study.  Not only will this save Lilly money, but it will serve to get this cmpd to the market sooner, thus working to meet another Lilly '09 Obj to "speed the delivery of innovative products to patients".

5. **Utilized Lilly's flexible work arrangements to focus on productivity & maintain work-life balance in Q1 and Q2 and on wkly basis in Q3 and Q4, with the support of my mgt.  I live ~1.5 hrs from Lilly, which means ~3 hrs of drive time on a daily basis to commute to & from work.  Worked from home 2-3 days/week & took flex Fridays as my schedule permits. IMPACT:** Flexibility created a work environment that supported my efforts as a Lilly employee to manage work & personal life responsibilities in the work place; address business needs as well as personal diverse needs, expectations, lifestyles, & work styles so I could work most productively.  Additionally this impacted my sense of commitment to my job because I valued the opportunity to achieve both professional & personal goals & decrease work-related stress.

# DEVELOPMENT PLAN

Stad De Lon

| GOAL | ACTIONS/ASSIGNMENTS | RESOURCES | TARGET DATE | RESULTS |
|---|---|---|---|---|
| Develop SCA skills to advance to the level of Senior SCA. | Present to Mgrs 101 Lecture Series re: STAG, SKE, Webtop. As CP Protocol SME, present to Bph grp mtg on latest update.<br><br>Take Technical Writing Course (BET#24000) offered through Lilly University.<br><br>Take HR job re-leveling training | Ask management to invite me to their lecture series to give this presentation: have made direct mgt aware of request. Preparation of a slide set with changes. Done. Tech writing Course: Cost $916.00; management approval. Done. | 31-Dec-2010 | Promoted to Sr. SCA.<br><br>Gave a presentation to the Biopharm group during their F2F meeting regarding the updates the the clinpharm protocol template on 02Mar09.  Giving presentations helps to build my confidence and leadership skills as well as provide useful information to customers.<br><br>Completed Day 1 of the technical writing course on 17June09.  Day 2 was scheduled for Oct, but instructor was ill and class was cancelled, therefore I will take Day 2 sometime in 2010. This course will increase my effectiveness in writing scientific |

| | | | | |
|---|---|---|---|---|
| | | | | Additionally this impacted my sense of commitment to my job because I valued the opportunity to achieve both professional & personal goals & it greatly decreased work-related stress. My goal, with the approval of management, is to become a full-time telecommuter. |
| Increase my understanding of the pharmacogenomics function as a possible career move. | Set up time with colleagues to discuss pharmacogenomic project opportunities within GMC. Explore possible courses available at IUPUI. | Time commitments from colleagues and from my schedule as well as financial support for an off-site course. | 24-Dec-2010 | Ongoing. |

* - Goal created based on e-COMPASS Feedback.

# Plan History For

Staci De Lon

| Phase | Status | Last Update Date | Last Updated By |
|---|---|---|---|
| Performance Planning | Active | 23-Jan-2009  09:58:37.37 | Staci De Lon |
| Performance Planning | Submitted | 26-Feb-2009  17:38:36.36 | Staci De Lon |
| Performance Planning | Approved | 27-Feb-2009  07:48:08.8 | Charlene Jones |
| Interim Review | Active | 27-Feb-2009  07:48:08.8 | Charlene Jones |
| Interim Review | Submitted | 19-Jul-2009  15:50:06.6 | Staci De Lon |
| Interim Review | Revise | 21-Jul-2009  14:50:41.41 | Charlene Jones |
| Interim Review | Active | 21-Jul-2009  14:50:42.42 | Charlene Jones |
| Interim Review | Submitted | 25-Jul-2009  13:48:59.59 | Staci De Lon |
| Interim Review | Approved | 27-Jul-2009  08:54:35.35 | Charlene Jones |
| Final Review | Active | 27-Jul-2009  08:54:35.35 | Charlene Jones |
| Final Review | Submitted | 28-Nov-2009  16:24:15.15 | Staci De Lon |
| Final Review | Active | 01-Dec-2009  12:22:41.41 | Charlene Jones |
| Final Review | Revise | 01-Dec-2009  12:22:41.41 | Charlene Jones |
| Final Review | Submitted | 08-Dec-2009  13:46:40.40 | Staci De Lon |
| Final Review | Signature Ready | 15-Dec-2009  11:17:41.41 | Charlene Jones |
| Final Review | Approved | 15-Dec-2009  11:17:41.41 | Charlene Jones |
| Final Review | Employee Signed | 15-Dec-2009  11:40:21.21 | Staci De Lon |
| Final Review | Completed | 15-Dec-2009  13:35:45.45 | Charlene Jones |

## Lilly Work/Life Operations



# Telecommuting Toolkit



EXHIBIT

2

Revised 4/12/2007

*Lilly*

Answers That Matter.

P2187

## TABLE OF CONTENTS

Introduction ................................................................................................1

What is Telecommuting? ...............................................................................2

    Who is eligible for telecommuting?

    Why does Lilly provide a telecommuting alternative?

    What about dependent care?

Characteristics of a Successful Telecommuting Arrangement ...........................3

    Job characteristics

    Employee characteristics

    Supervisor characteristics

Developing a Successful Telecommuting Arrangement .....................................4

    What IS NOT affected by a telecommuting arrangement?

    What IS affected by a telecommuting arrangement?

    What should the supervisor expect from employees?

    What should employees expect from the supervisor?

Your Lilly-Provided Home Office ...................................................................5

    Your workspace

    Your office at Lilly

    What Lilly provides

    Your responsibilities

Your Schedule ............................................................................................7

    Watch out for workaholism

    Handling absences

    For overtime-eligible employees

Compensation, Benefits, and Performance Management ..................................8

    Compensation and benefits

    Performance Management

Special Message to Supervisors ....................................................................9

    Thinking it through

Estimate of Telecommuting Expenses ...........................................................10

    Alternatives for Data Connectivity for the Teleworker

    Ongoing monthly expenses

Next steps .................................................................................................12

Your Transition to the Telecommuting program ............................................13

Teleworker Training Course .........................................................................14

Leaving the Teleworker Program ..................................................................15

Revised 4/11/07

# Introduction

In the waning hours of a Friday afternoon, you face the fact that the report you'd vowed to complete this week is doomed to remain undone. Constant interruptions at the office have made it difficult to devote the type of time and concentration the project requires. It is a scenario that frustrates you all too often.

The company believes that, in the right situations, telecommuting can help employees increase personal productivity, effectiveness, and job satisfaction. It is just one of the company's work productivity tools to help achieve Lilly's goals. Other alternative work arrangements, such as flextime, part-time and job sharing, also contribute to this goal.

This guide, while frequently directed to the teleworker, will help lead both employee and supervisor through the whys and hows of telecommuting at Lilly. The guide will also refer you to other company resources located within LillyNet, including:

- *The Information Asset Protection Policy*, which provides corporate guidelines for securing information systems and is available at http://lillyapp8.am.lilly.com/compliance/policiesan dprocedures.html on LillyNet.

- *Red Book (standards of business conduct)*, which establishes rules that all Lilly employee must follow, regardless of office location, and is available at http://lillyapp8.am.lilly.com/compliance/redbook.ht ml

- The U.S. Employee Handbook, which is available in LillyNet. Within the Subject Guide of LillyNet, view the Human Resources Links and then HR Direct choice and you'll see the Employee Handbook (US).

P2189

## What is Telecommuting?

As a teleworker at Eli Lilly and Company, your Lilly-provided office will be at your home.  If you live near your workgroup's Lilly facility, you'll typically work at your home office 80 percent of the time (three or four days a week for a full time employee) and at Lilly, for "team days," 20 percent of the time (one or two days a week).  On team days, teleworkers can participate in required face-to-face meetings and attend to any other duties that must be performed on-site; however, the majority of the teleworker's work products are produced at home. You and your supervisor might want to consider whether or not a work space will be available to you on your "team days."

### Who is eligible for telecommuting?

Telecommuting is an agreement between supervisor and employee, with full support from human resources.  Open to employees working a full- or part-time schedule, telecommuting is based on the needs and requirements of the job, the work group, and the company.  Although Lilly encourages each teleworker to continue with the telecommuting arrangement for at least a year, telecommuting is voluntary, and either the employee or supervisor can end the arrangement at any time.

At times, there may be business reasons to consider two additional telecommuting arrangements:

- Hiring an employee directly into a telecommuting arrangement

- Moving an employee into an international telecommuting arrangement.

Both of these situations require very careful consideration to make sure that they will be successful, meet business needs, and are cost effective.  In both cases, supervisors and employees should discuss the possibilities with their human resources representatives as well as accessing the document *Telecommuting: New Hires and International Employees*

### Why does Lilly provide a telecommuting alternative?

Achieving long-term success depends upon each employee in the company performing at his or her best and each work group contributing to the company's goals.  This ideal is the driving force behind telecommuting.

Companies who have successfully implemented telecommuting have reported dramatic increases in productivity.  In jobs that do not require much face-to-face interaction, telecommuting can increase an employee's output.  This increased productivity can provide a competitive advantage and is Lilly's primary goal in implementing telecommuting.

In addition, telecommuting, as another alternative work arrangement, offers flexibility for employees.  It decreases the time and expense of commuting and relieves some of the stresses associated with the standard work week. Because your work hours are set by you through an agreement with your supervisor, telecommuting can provide some assistance with managing your work and your personal life responsibilities.

### What about dependent care?

While telecommuting may seem, at first, to be an alternative to locating and using outside child-care, experience has shown that this is not the case.  The arrangement may allow you some more family time by reducing the time you spend commuting, but it won't relieve your need to arrange for child-care.  Trying to work while a child is competing for your attention can be distracting to you and confusing to your child. Therefore, while you are working, your children or other dependents must be under the care of another adult, for the sake of both your productivity and their safety and well being.

P2190

# Characteristics of a Successful Telecommuting Arrangement

While telecommuting is an attractive option for some jobs and some employees, it isn't for everyone. A specific blend of job, employee, and supervisor characteristics is required to create a successful telecommuting arrangement. Generally, it works well for employees who work with a high level of independence in a job that requires little face-to-face interaction with others. Here are some things to consider when deciding if working from home is right for you:

## Job characteristics
The ideal job for teleworking has these qualities:

- Minimal face-to-face interaction required (communication can be handled primarily via phone, voice mail, or electronic mail)

- Many tasks are performed alone (for example, writing, reading, planning, telephoning, and computer work)

- Tasks and work products are clearly defined

- Outputs from work activities are measurable

- Objectives have identifiable time frames and milestones

- Tasks often require concentration and/or large blocks of uninterrupted time

- There are minimal requirements for special equipment.

## Employee characteristics
The ideal employee for teleworking has these qualities:

- Enjoys working from home and has a strong desire to make telecommuting work

- Is highly knowledgeable and skilled in the job

- Is self-motivated, self-disciplined, and self-directed, requiring minimal supervision

- Has strong time-management skills

- Has strong organizational skills

- Is comfortable working alone

- Is highly productive

- Is able to meet clear standards and objectives

- Has an appropriate home environment (for example, a dedicated space with few distractions).

## Supervisor characteristics
Successful telecommuting requires a supervisor who effectively manages the situation. The teleworker, like other employees, needs clear objectives and feedback, and "space" to complete the work independently. Most of the time, the supervisor won't be able to just stop in with bits of information or direction as he or she might do with on-site employees. The ideal supervisor for teleworking has these qualities:

- Possesses an open, positive attitude toward telecommuting

- Establishes mutual trust and respect with the employee

- Shows strong organizational and planning skills

- Establishes clear objectives and measurements

- Provides regular feedback

- Encourages open communication

- Exhibits flexible and innovative approaches to supervision.

# Developing a Successful Telecommuting Arrangement

### What IS NOT affected by a telecommuting arrangement?

- Accountability for job requirements
- Work performance standards
- How performance is evaluated
- The requirement to meet business needs
- Professional business behavior

### What IS affected by a telecommuting arrangement?

- The primary office space
- Means of communication

### What should the supervisor expect from employees?

- Consideration and ownership of business needs
- Flexibility
- Clear, consistent communication
- Continued, satisfactory work performance with clear outcomes
- Commitment to shared responsibility working in partnership with the supervisor
- Full utilization of the Performance Management process

### What should employees expect from the supervisor?

- Careful consideration of their proposal for a telecommuting arrangement
- Clear, consistent communication
- Clear expectations
- Full utilization of the Performance Management process
- Plan for periodic reviews
- Support for maintaining an effective telecommuting arrangement

P2192

# Your Lilly-Provided Home Office

In the past you might have completed your occasional weekend take-home work on your kitchen table, your couch, or even your bed. As a teleworker, these arrangements won't work.

## Your workspace

A dedicated workspace with a good chair, desk, lighting, and other equipment will help save your back, your eyesight, and your positive attitude. Setting up and organizing your space will take time up front, but it is time well spent toward making you a healthier, happier teleworker.

You'll need a clearly defined space, preferably a room with a door but possibly a corner of a larger room. The separate room offers many advantages, as a closed door can tell your family, "I'm working now," or help you make it through the weekend without having to stare at the tasks awaiting you "at work." Whatever space you choose, it must be large enough to accommodate the office furniture and equipment you will use.

## Your office at Lilly

When you join the Telecommuting program, the office space and phone you used at Lilly will typically go away because your primary office is at home. If necessary, work with your supervisor to determine a workspace where you will use a phone and desk on your "team days" at the Lilly office. But remember, team days are intended to give you the opportunity to do things you cannot do from home, such as face-to-face meetings with coworkers and the supervisor.

## What Lilly provides

Through carefully selected vendors, Lilly provides the furniture, phone system, technology tools, office supplies, and training you need. (All expenses must be approved by your supervisor and paid by your department.) The Telecommuting program provides coordination for the installation of furniture and equipment.

## Furniture

Lilly has selected furniture for superior form, function, and ergonomics. Basic items include a desk, table, credenza, file cabinets, storage cabinet, and desk chair. At your management's discretion, you can choose additional options. Furniture is delivered and set up for you in your home office.

## Phone system

Your phone system is designed to make it transparent to people that you work from home. For example, your office telephone number will not change when you start working from home. When someone calls your "old" office telephone number, the phone system rolls it over to your home office phone line. Your department pays for all your business phone calls and phone service on your Lilly-supplied phone line.

## Technology tools

Your home office, depending on your job's requirements, will likely become a small hub of technology with computer, printer, fax machine (which doubles as a small-run copier), phone line, data line, voice mail, and electronic mail. These items will be provided by the Telecommuting program and paid for by your department.

While you don't need to become a technology guru, you will be expected to become familiar with your computer and equipment. You might miss the luxury of having people stand beside you and help you through technical difficulties, but the help desk is always only a phone call away.

## Office supplies

Your department provides your office supplies. You can pick them up from your area's supply closet when you're in the office for team days, or you can make other arrangements with your management.

## Training

Every employee and supervisor involved in the Telecommuting program completes a training course that provides essential information and tips. See page 14 for further details.

## Your responsibilities

As described in the following section, you are responsible for providing space, utilities, and architectural modifications. Also, you must ensure safety and security of your workspace for yourself and the Lilly equipment.

➡ continued

P2193

 *"Your Lilly-Provided Home Office,"* continued

### Financial obligations

As a Lilly teleworker, you provide the office space and electricity, heat, and air conditioning. The company will not provide architectural modifications. So if you're thinking of adding a door, a wall, a room, etc., to your home, this is entirely up to you and your budget. The same is true for taxes. It's unlikely your home office will have any tax implications for you. The company encourages its teleworkers to talk with a tax advisor before claiming deductions for a home office.

### Health and safety

Each teleworker is responsible for maintaining a safe work environment, free from hazards and other dangers. For example, it is your responsibility to ensure that electrical wiring in your home office supports, and is sufficient for, the equipment provided by Lilly.

A teleworker's work-related illnesses and injuries are subject to the same compensation policy and procedures as those for other Lilly employees. (For more information, see your employee handbook.)

### Usage and confidentiality

The equipment and information in your office is Lilly property and is for business use only.

Just as you would at an on-site office, safeguard the confidentiality of documents that you work on in your house, and discuss any specific information security needs with your supervisor.

P2194

## Your Schedule

As with any job at Lilly, the teleworker's work schedule is determined by an arrangement between employee and supervisor. Of course, all of the company's policies about attendance and hours worked also apply to teleworkers. As with employees who regularly travel to work each day, travel time to and from Lilly on team days or at other times is not considered part of the teleworker's working hours.

### Watch out for workaholism

The convenience of the home office has turned many a teleworker into a workaholic. After all, you will never truly leave your office, and without the psychological effect of driving home from work, too many teleworkers find themselves sneaking back into their home office to finish "just one more thing." This seemingly dedicated practice actually can quickly lead to burnout on the part of the employee and his or her family. Lilly makes this recommendation to its teleworkers when considering "after-hours" work: if you wouldn't drive back to the office to complete the task if you were an on-site employee, then don't walk back into your home office to complete the task as a teleworker.

### Handling absences

All teleworkers are subject to the same procedures for handling absences as on-site employees. At a minimum, teleworkers should call in and alert their supervisor when they are taking a day off because of illness, vacation, or any other reason. It keeps the lines of communication open within your work group and fulfills legal timekeeping requirements. See your employee handbook for additional information.

### For overtime-eligible employees

Accurate timekeeping is especially important for overtime-eligible employees. Teleworkers are eligible for overtime under the same guidelines as any Lilly employee in a nonexempt job. Even if you're not eligible for overtime, you will want to maintain the schedule agreed upon by your supervisor. This helps you make sure you've worked the appropriate amount of time and, as is more commonly the case with teleworkers, that you're not working excessively.

P2195

# Compensation, Benefits, and Performance Management

As you've probably gathered by now, teleworkers differ from other Lilly employees in only one respect: their work site. This continues to be true in the area of compensation, benefits, and Performance Management.

## Compensation and benefits

Your compensation and benefits are not affected by your involvement in the Telecommuting program.

## Performance Management

Performance Management works the same way for all employees, regardless of work site. Teleworkers should set objectives and participate in performance reviews at the same intervals as other Lilly employees. In fact, the objectives set in Performance Management can be especially helpful to the teleworker, who must have clearly defined tasks and goals for ultimate work-from-home success. **For your telecommuting arrangement to be successful, you and your supervisor *must* establish clear performance expectations and agree on appropriate measures of success as well as intervals for interim reviews.**

Before beginning your telecommuting experience, it would be wise to review your performance objectives with your supervisor. Some adjustments may be necessary if you are taking on new challenges or leaving behind some strictly on-site tasks.

P2196

## Special Message to Supervisors

If you're reading this in anticipation of supervising a teleworker, all the information in this guide is important for you to know. Yet, you still may find yourself wondering how to manage an employee who is out of your sight most of the time.

The answer is not much differently than how you manage on-site employees. Most of the skills you use in managing on-site employees are the ones you'll need to manage a teleworker, with a few adjustments.

A publication called *The Virtual Workplace* offers this summary of what managing teleworkers involves:

*When you manage at a distance, you:*

*Still have access—but it's more planned, less spontaneous*

*Still stay in contact—but it's more electronic, less in-person*

*Still can observe work—but it's more results, less activity*

*Still are accessible—but it's more planned, less "hall time"*

*Still can give feedback—but it's more planned, less in-person*

*Still can have teamwork—but it's more planned, less automatic.*

### Thinking it through

Perhaps the biggest factor in ensuring telecommuting success is making sure you have the right combination of job, employee, and supervisor. (See "Who is eligible for telecommuting?" on page 2.) In addition, think through the following questions as a supervisor initially evaluating a potential telecommuting arrangement:

- Can telecommuting enhance productivity in this job?

- Can the job be performed with minimal face-to-face interaction outside scheduled team days?

- Can your area support the cost of furniture and additional equipment needed for the home office?

- Is the employee a strong, self-disciplined performer?

- Will the employee have other arrangements for dependent care?

- Can you provide clear objectives, timelines, and measurements for work projects?

- Can you commit to clearly defined Performance Management reviews?

- Do you and the employee have a high level of mutual trust as well as a commitment to communication with one another and within your team?

If you can answer "yes" to these questions and if you feel positive about the potential of a telecommuting arrangement, then it may be a possibility worth exploring. A little hesitancy on the part of the supervisor first considering a telecommuting arrangement is to be expected, but with an open mind, careful planning, and diligent communication, "managing from a distance" can be a very successful and productive experience.

P2197

# Estimate of Telecommuting Expenses

Just as there are expenses in setting up and supporting an employee's workspace at a Lilly site, there are expenses associated with setting up and supporting a teleworker's home office.

### Alternatives for Data Connectivity for the Teleworker

Before enrolling in the Teleworker program, if you would like more information about any of the technical (IT) aspects of the program, contact 7-7000, the IT Computing Support Center.

1. Broadband/Virtual Private Network (VPN) is the most desirable and best-performing option, but it requires that the teleworker have one of three broadband alternatives available at his or her residence: AT&T DSL, Time Warner cable modem, or Comcast business cable modem. Lilly has partnered with these three providers and will be directly invoiced for their services.

   An additional option, when one of the above-mentioned three providers is not available in the teleworker's geographic area, is Bring Your Own Access (BYOA). For the "BYOA" broadband, the teleworker contracts with a local broadband provider (whose services meet Lilly telecommunications criteria) and uses this broadband service to connect to Lilly's network. The teleworker will need to expense the associated costs back to the company.

   The very first step in initiating the teleworking arrangement allows provides the mechanism for the Information Technology group to evaluate the teleworker's situation regarding data connectivity (see the **Next Steps** section later in this document.)

2. If broadband is not available to teleworkers, their only option will be to connect to the Lilly network dial-up (iPass). Note that the dial-up service offers the teleworker a response time that is significantly slower than what is available via broadband and therefore may not be suitable for the teleworker's business requirements.

### Estimate of Initial Setup Expenses for Data Connectivity

The setup costs for Broadband VPN will range from $0 to $145. The initial setup cost for BYOA broadband will vary, depending upon the provider.

### Estimate of Initial Setup Expenses for Office Equipment, Furniture, and Telephone

The following are components of the office equipment, furniture, and telephone for the telecommuter and will require an initial investment of approximately $5,000:

#### Equipment
- Desktop PC and monitor
- Printer/copier/fax
- Two-line business phone

#### Furniture
- Desk with keyboard
- Table
- Credenza
- Two-drawer pedestal file
- Two-drawer lateral file

P2198

- Storage shelf
- Chair

**Phone Installation**

- Phone (lines, voice mail).

## Ongoing monthly expenses

| Service | How charges occur | Approximate monthly charge |
|---|---|---|
| Broadband VPN | Corporate telecommunications receives the bill and charges it back to the individual department | $50-$225 |
| Bring-your-own-access Broadband VPN | Teleworker is billed directly and is reimbursed via EERS or another means | Charges vary |
| iPass (dial-up) | Corporate telecommunications receives the bill and charges it back to the individual department | $0.40 per hour – local access $3.00 per hour – toll-free number for long-distance access |

*plus*

| Service | How charges occur | Approximate monthly charge |
|---|---|---|
| telephone | The teleworker is billed directly and is reimbursed via EERS | $100-$500 (depending on the type of phone calls that the individual makes) |

For more information on broadband VPN, visit
http://eiszone3.d80.lilly.com/ghi/au000118.nsf/pages/telecomm_Broadband_VPN_RAS

Revised 4/11/07

11

P2199

## Next steps

The following table describes the stages involved in getting started as a teleworker.

| | Here's What Happens | Comments |
|---|---|---|
| 1 | Initiate your telecommuting request with your supervisor. Review the Telecommuting Toolkit (this document) together. Determine if the characteristics of the job, employee, and the supervisor would support telecommuting. (If cable or DSL broadband access are not available within the geographic area where the teleworker will reside, teleworking may not be a viable option.) Talk with your human resources representative about the telecommuting option. | Download the document from HR Direct Online within LillyNet. |
| 2 | To enroll in the teleworker program, call the IT Computing Support Center at 7-7000. Be sure to have all of the information available regarding your future geographic location. You will discuss the connectivity options with IT support in the event that cable or DSL high speed connectivity are not available. | **Call 7-7000** |
| 3 | Once you have been qualified for high-speed connectivity (or it has been determined that your only option for connectivity is dial-up), you and your supervisor sign the **Telecommuting Agreement** form. You will send the original to your Human Resources Representative, keep a copy for yourself, and send a copy to the IT Telecommuter Coordinator.* The form indicates your understanding of the responsibilities and conditions of the telecommuting program and your supervisor's understanding and approval. | **Access the Telecommuting Agreement form at** http://elvis5.d51.lilly.com/hremp/ HRDirectnewsite/Telecommuting Agreement.doc |
| 4 | If you haven't already done so, take the ErgoSmart online course in the Virtual Learning Centre. (This course is a prerequisite for the Telecommuting Training course.) | The training course is required. It is available at http://lillyu.d51.lilly.com/. |
| 5 | The Telecommuter Coordinator* will register you and your supervisor for the Telecommuting Training (course #IS28475) after all paperwork is received and processed. | The training course is required. You will receive confirmation via email that you have been enrolled. Also be sure to obtain the name of the current IT Telecommuter Coordinator.* |
| 6 | Work closely with your supervisor to define clear work expectations and goals. Determine logistics such as: Do you need to obtain a credit card and long-distance phone card? And if you're moving, remember to change your address in the system and to check on insurance if you are moving to a different state. | |
| 7 | The IT Telecommuter Coordinator* will provide you with a packet containing a checklist that will guide the teleworker through the details of setting up a home office. | |

Note: **The IT Telecommuting Coordinator is currently Edward Villacorta.**

Revised 4/11/07

P2200

# Your Transition to the Telecommuting program

From establishing a schedule for team days to figuring out how to run the fax machine, you can expect an initial transition period that will bring with it the difficulties of any significant change. You also can expect to experience the unique joys of telecommuting, such as uninterrupted work time and the comfort of wearing a sweatshirt while working at your computer.

Within several weeks, the teleworker and telemanager will be in a new work routine and should be realizing the goal of telecommuting—increased productivity.

Plan to check in with each other regularly for honest "How's it going?" conversations. You are encouraged to continue the arrangement for a year to give it a chance to succeed. Every telecommuting arrangement should be reviewed on a regular basis to be sure it still meets business needs as well as the needs of the employee. Remember, telecommuting is a voluntary arrangement and can be terminated at any time by the employee or the supervisor involved.

P2201

# Teleworker Training Course

This course is **REQUIRED** for all Teleworkers and Telemanagers to benefit you in getting started working from home.

**Location:** Wabash Room, Bldg. 98

**Times:**    Teleworkers: 8:00-5:00
              Telemanagers: 8:00-12:00

**2007 Dates**

April 19
May 23
June 28
July 19
August 23
September 27

**Topics:** *(subject to change)*

**Morning Session (Teleworker AND Telemanager)**
- Video on *The Virtual Office*
- Overview of the Telecommuting program
- Review *The Virtual Workplace* handbook

**Afternoon Session (Teleworker only)**
- Workspace Considerations
- Furniture
- Ergonomics
- Safety
- Technology
- Computer, Phone and All-in-One printer/fax/copier/scanner)
- Voice Mail
- Resources
- Overview of Help Options
- Help Desk
- Telecommuting Collaboration Space
- Tips and Best Practices

P2202

# Leaving the teleworker program

At some point, you may wish to leave the teleworker program and return to a more traditional work arrangement. This may be the result of a desire to move to a new job that cannot be done via teleworking or a change in the job content of your existing job that makes it unsuitable for teleworking.

Just as there were arrangements to move you into the program, there are also things to be done when you leave. The Telecommuter Coordinator* will help you return equipment and furniture and will also help with disconnecting phone and data communication services.

To start the process, simply call the Computing Support Center at 317-277-7000 or 1-877-367-2301, or submit a trouble ticket via LillyNet at http://7-7000/

P2203



# Telecommuting
# Overview

*Lilly*

Answers That Matter.

Revised 8/25/2009                    1 of 11

P2204

# Telecommuting Overview

In the right situations, telecommuting can meet business needs while helping employees increase effectiveness and personal productivity. Within the basic framework of a telecommuting arrangement, you would:

- Work primarily at a computer, by phone or by fax, and with very few face-to-face interactions
- Work at home
- Commute to your Lilly work site on regular basis
- Enter a formal agreement (between you and your supervisor) with a memorandum available through Office of Work/Life Balance
- Be available and accessible during core business hours (9:00 a.m. to 3:00 p.m.), Monday through Friday

Developing a successful telecommuting arrangement requires a considerable amount of analysis and planning, as well as ongoing communication and review. This overview contains guidelines and information that you and your supervisor can use to determine whether a telecommuting option would be a good fit for your job requirements, your work group, and you.

## Program Specifics

### How does telecommuting work?

As a telecommuter—or teleworker—your Lilly-provided office is in your home. If you live near your group's Lilly offices, you'll typically work in your home office 80 percent of the time (four days per week for a full-time employee) and at Lilly for team days 20 percent of the time (one day per week). If you don't live near your group's offices, you'll travel there on an as-needed basis. The majority of your work will be produced in your home office, and on team days, you'll have face-to-face meetings and attend to any other duties that must be performed on-site.

Although Lilly encourages continuing a telecommuting arrangement for at least one year, telecommuting is voluntary, and either the employee or supervisor can end the arrangement at any time.

### Who is eligible for telecommuting?

A telecommuting arrangement is a formal agreement between supervisor and employee, with full support from human resources. Open to employees working a full-time schedule, telecommuting is based on the needs and requirements of the job, the work group, and the company.

Revised 8/31/2009

2 of 11

P2205

In certain situations, business reasons might call for hiring an employee directly into a telecommuting arrangement. Such cases require careful consideration to ensure success.

### What about dependent care?

Telecommuting is not an alternative to locating and utilizing dependent care. While a telecommuting arrangement may provide more family time by reducing your commute, it won't relieve your need to arrange for dependent care. When making arrangements to work from home, you must make arrangements for your dependents to be under the care of another adult.

## Keys to Success

While telecommuting is an attractive option for some jobs and some employees, it isn't for everyone. A specific blend of job, employee, and supervisor characteristics is required to create a successful telecommuting situation. Generally, it works well for employees who work with a high level of independence in a job that requires little face-to-face interaction with others. Here are some things to consider when deciding if working from home is right for you:

### Job characteristics

**The ideal job for teleworking has these qualities:**

- **Minimal face-to-face interaction required (communication can be handled primarily via phone, voice mail, or e-mail)**
- **Many tasks are performed alone (for example, writing, reading, planning, telephoning, and computer work)**
- **Tasks and work products are clearly defined**
- **Outputs from work activities are measurable**
- **Objectives have identifiable time frames and milestones**
- **Tasks often require high levels of concentration or large blocks of uninterrupted time**

### Employee characteristics

The ideal employee for teleworking has these qualities:

- Enjoys working from home and has a strong desire to make telecommuting work
- Is highly knowledgeable and skilled in the job

Revised 8/31/2009

P2206

- Is self-motivated, self-disciplined, and self-directed, requiring minimal supervision
- Has strong time-management skills
- Has strong organizational skills
- Is comfortable working alone
- Is highly productive
- Is able to meet clear standards and objectives
- Has an appropriate home environment (for example, a dedicated space with few distractions)

### Supervisor characteristics

In a telecommuting arrangement, a good supervisor has these qualities:

- Establishes mutual trust and respect with employees
- Shows strong organizational and planning skills
- Establishes clear objectives and measurements
- Provides regular feedback
- Encourages open communication
- Exhibits flexible and innovative approaches to supervision

## Expectations for Successful Telecommuting

### What changes in a telecommuting arrangement?

- Primary office space is in the employee's home
- Communication is less frequently in person

### What doesn't change in a telecommuting arrangement?

- Accountability for job requirements
- Work performance standards
- How performance is evaluated
- The requirement to meet business needs
- Professional business behavior

### What should a supervisor expect from a telecommuting employee?

- Consideration and ownership of business needs
- Flexibility
- Clear, consistent communication
- Continued, satisfactory work performance with clear outcomes
- Commitment to shared responsibility working in partnership with the supervisor

P2207

• Full utilization of the Performance Management process

*What should a teleworker expect from a supervisor?*

• Careful consideration of the proposal for a telecommuting arrangement
• Resources and tools required to be successful
• Clear, consistent communication
• Clear expectations
• Full utilization of the Performance Management process
• Plan for periodic reviews
• Support for maintaining an effective telecommuting arrangement

## Lilly-Provided Home Office

### Your workspace

You'll need a clearly defined space, preferably a room with a door but possibly the corner of a larger room. Whatever space you choose, it must be large enough to accommodate the Lilly-provided office furniture and equipment you'll be using.

### Your office at Lilly

When you become a teleworker with a home office, the office and phone you used at Lilly typically will no longer be needed. If it's necessary, you and your supervisor can decide on a workspace that you can use on your team days at Lilly. But remember that team days are intended to provide an opportunity to do what you can't do from home, including face-to-face meetings with your supervisor and coworkers.

### What Lilly provides

Through carefully selected vendors, Lilly provides the furniture, phone system, technology tools, office supplies, and training you need. (All expenses must be approved by your supervisor and paid by your department.)

Furniture
Lilly has selected furniture for superior form, function, and ergonomics. Basic items include a desk, table, credenza, file cabinets, storage cabinet, and desk chair. At your supervisor's discretion, you can choose additional options. Furniture is delivered and set up for you in your home office.

P2208

Telephone system
The Lilly-provided telephone system makes it possible for you to retain your 'old' office telephone number, by rolling that number over to your new home office phone line.  Your department pays for all business phone service on your Lilly-supplied line.

Technology tools
Depending on your job's requirements, your home office will likely be equipped with a computer, printer (which doubles as a small-run copier and fax machine), phone line, data line, voice mail, and e-mail.  These items will be provided by the telecommuting program and paid for by your department.

Office supplies
Your department provides your office supplies.  You can pick them up from your area's supply closet when you're in the office for team days, or you can make other arrangements with your supervisor.

Training
Every employee and supervisor involved in the telecommuting program completes a training course that provides essential information and tips.

Travel
If residing outside of commuting distance of your Lilly worksite, you may be reimbursed for reasonable travel expenses to travel to your Lilly worksite on an as-needed basis.  All travel is subject to supervisor approval, is reimbursed, and must meet all requirements of the U.S. Procedure on Travel and Expense Reporting.

*Your responsibilities*

Financial obligations
For your office at home, you provide the workspace as well as electricity, heat, and air conditioning.  The company will not provide architectural modifications, so if you would like to add a door, a wall, or a room to your home, this is entirely dependent upon you and your budget.

Health and safety
Each teleworker is responsible for maintaining a safe work environment that is free from hazards and other dangers.  For example, it is your responsibility to ensure that electrical wiring in your home office supports and is sufficient for Lilly-provided equipment.

A teleworker's work-related illnesses and injuries are subject to the same compensation policy and procedures as those for other Lilly employees.  (For more information, see the *U.S. Employee Handbook* on HR Direct.)

Usage and confidentiality
The equipment and information in your home office is Lilly property and is for business use.

Just as you would at an on-site location, safeguard the confidentiality of documents that you work on in your house, and discuss any specific information security needs with your supervisor.

## Your Schedule

As with any job at Lilly, the teleworker's schedule is determined by an arrangement between employee and supervisor.  All of the company's policies about attendance and hours worked also apply to teleworkers.  Just as in a typical office-based schedule, you can vary the time you begin and end work while maintaining Lilly's core business hours:

typical starting time            between 6:00 a.m. and 9:00 a.m.

*core business hours*          *from 9:00 a.m. to 3:00 p.m.*

typical ending time            between 3:00 p.m. and 6:00 p.m.

On team days, travel to and from Lilly is not considered part of the teleworker's working hours.

For the standard week, telecommuting employees must work:

- a minimum of 40 hours per week.
- a minimum of 8 hours per day plus a lunch break generally lasting 45 minutes (lunch period/break of at least 30 minutes required)
- typically in your home office 80 percent of the time (four days per week) and at Lilly for team days 20 percent of the time (one day per week)
- and be available and accessible during core hours (9:00 a.m. to 3:00 p.m.) on work days, regardless of location

**Handling absences**
All teleworkers are subject to the same procedures for handling absences as on-site employees.  Teleworkers must call in if they will not be working on a certain day due to illness and provide notice of planned days off for vacation or other reasons.  See the *Employee Handbook* for additional information.

P2210

**For overtime-eligible employees**

Accurate timekeeping is especially important for overtime-eligible employees.  Teleworkers are eligible for overtime under the same guidelines as any Lilly employee in a non-exempt job.

## Compensation and Benefits

Your full-time compensation and benefits are not affected by your involvement in the telecommuting program.

## Performance Management

Performance Management works the same way for all employees, regardless of work site.  Before beginning your telecommuting experience, review your performance objectives with your supervisor.  Some adjustments may be necessary if you are taking on new challenges or leaving behind some strictly on-site tasks.

Teleworkers should set objectives and participate in performance reviews at the same intervals as other Lilly employees.  In fact, the objectives set in Performance Management can be especially helpful to the teleworker, who must have clearly defined tasks and goals for ultimate work-from-home success.  You and your supervisor must establish clear performance expectations and agree on appropriate measures of success as well as intervals for interim reviews.

## Next Steps

The following table describes the stages involved in getting started as a teleworker.

| Here's What Happens | Comments |
| --- | --- |
| • Review the *Telecommuting Overview.*<br>• Initiate your telecommuting request with your supervisor.<br>• Determine if the characteristics of the job, employee, and the supervisor would support telecommuting. | |
| • You and your supervisor sign the **Telecommuting Agreement** form.<br>• Send the original to Charlotte Hawthorne at Drop Code 1029 and keep a copy for yourself.  The form indicates your understanding of the responsibilities and conditions of the telecommuting program and your supervisor's understanding and approval. | |
| • You will be contacted by the telecommuter coordinator, who will provide you with a checklist that will guide you through the details of setting up a home office and register you and your supervisor for the Telecommuting Training. | The training course is required. It is available at http://lillyu.d51.lilly.com/. |
| • Work with your supervisor to define clear work expectations and goals.  Determine specifics such as whether you will need to obtain a credit card and expectations regarding travel to the worksite. | |

At some point, you might want to leave the teleworker program and return to a more traditional work arrangement.  This may be the result of a desire to move to a new job that cannot be done via teleworking or a change in the content of your existing job that makes it unsuitable for teleworking.

Just as there were arrangements to move you into the program, there are also things to be done when you leave.  The telecommuter coordinator will help you return equipment and furniture and will also help with disconnecting phone and data communication services.

P2212

## For the Supervisor

If you will be supervising a teleworker, it's important to remember that most of the skills you use in managing on-site employees are the same ones you'll need to manage a teleworker, with a few adjustments.

A publication called *The Virtual Workplace* offers this summary of what managing teleworkers involves:

When you manage at a distance, you:

*Still have access—but it's more planned, less spontaneous*
*Still stay in contact—but it's more electronic, less in-person*
*Still can observe work—but it's more results, less activity*
*Still are accessible—but it's more planned, less "hall time"*
*Still can give feedback—but it's more planned, less in-person*
*Still can have teamwork—but it's more planned, less automatic.*

### Thinking it through

The biggest factor in ensuring telecommuting success is ensuring you have the right combination of job, employee, and supervisor.  (See *Who is eligible for telecommuting?* in the *Telecommuting Overview*.)  If you are a supervisor evaluating a potential telecommuting arrangement, you'll want to think through these questions:

- Can telecommuting enhance productivity in this job?
- Can the job be performed with minimal face-to-face interaction outside scheduled team days?
- Can your area support the cost of furniture and additional equipment needed for the home office?
- Is the employee a strong, self-disciplined performer?
- Will the employee have other arrangements for dependent care?
- Can you provide clear objectives, timelines, and measurements for work projects?
- Can you commit to clearly defined Performance Management reviews?
- Do you and the employee have a high level of mutual trust as well as a commitment to communication with one another and within your team?

If you can answer "yes" to these questions, then telecommuting is worth exploring.  With careful planning and diligent communication, managing from a distance can be a successful and productive experience.

## Estimate of Telecommuting Expenses

Just as there are expenses in setting up and supporting an employee's workspace at a Lilly site, there are expenses associated with setting up and supporting a teleworker's home office.

For broadband, the teleworker contracts with a local provider (whose services meet Lilly telecommunications criteria) and uses this broadband service to connect to Lilly's network.  The teleworker will need to expense the associated costs back to the company.

Please note that the very first step in initiating the teleworking arrangement provides the mechanism for the Information Technology group to evaluate the teleworker's situation regarding data connectivity.

### Ongoing monthly expenses

| | How charges occur | Approximate monthly charge |
|---|---|---|
| Broadband VPN | Teleworker is billed directly and is reimbursed via EERS or another means | $50 |
| iPass (dial-up) | Corporate telecommunications receives the bill and charges it back to the individual department | $0.40 per hour – local access<br>$3.00 per hour – toll-free number for long-distance access |
| Telephone | The teleworker is billed directly and is reimbursed via EERS | $100-$500 (depending on the type of phone calls the individual makes) |
| Furniture | Start up cost is billed to department | $5000 |
| Office Equipment – Printer/Fax/Copier Shredder, Office Supplies and Misc. Equipment | | $1000 |

P2214