UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

STACI L. DELON,                    )
        *Plaintiff*,               )
        *vs.*                      )
                                   )    No. 1:12-cv-00556-JMS-MJD
ELI LILLY & CO.,                   )
        *Defendant*.               )

## ORDER

Plaintiff Staci DeLon, a former employee of Defendant Eli Lilly and Company ("Lilly"),

brings this suit against Lilly, asserting claims under the Americans with Disabilities Act

("ADA") and the Employee Retirement Income Security Act ("ERISA").   Presently pending

before the Court is Lilly's Motion for Summary Judgment.  [Dkt. 68.]  For the reasons that fol-

low, the Court **GRANTS** Lilly's Motion for Summary Judgment.

## I.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because

there is no genuine dispute as to any material fact and, instead, the movant is entitled to judg-

ment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  As the current version of Rule 56 makes

clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must sup-

port the asserted fact by citing to particular parts of the record, including depositions, documents,

or affidavits.  Fed. R. Civ. P. 56(c)(1)(A).  A party can also support a fact by showing that the

materials cited do not establish the absence or presence of a genuine dispute or that the adverse

party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1)(B).  Affi-

davits or declarations must be made on personal knowledge, set out facts that would be admissi-

ble in evidence, and show that the affiant is competent to testify on matters stated.  Fed. R. Civ.

P. 56(c)(4).  Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment.  Fed. R. Civ. P. 56(e).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events.  *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003).  The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party.  *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009).  The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008).  It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder.  *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).  The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898.  Any doubt as to the existence of a genuine issue for trial is resolved against the moving party.  *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

## II.
### BACKGROUND

The following factual background is drawn from the admissible evidence presented by the parties.  The facts presented are those that are undisputed or, if disputed, are set forth in the light most favorable to the non-movant, Ms. DeLon.

Ms. DeLon was hired by Lilly in 2001 as a pharmocokinetics operations associate.  [Dkt. 76-1 at 1.]  In 2004, she transferred to the position of scientific communications associate, and

by 2006, was promoted to senior scientific communications associate.  [*Id.*]  She remained in that position until June 2010, when Lilly terminated her employment.  [*Id.* at 10.]

In 2007, Ms. DeLon was diagnosed with Cushing's Syndrome.  [*Id.* at 2.]  This and other medical issues led Ms. DeLon to suffer from, among other things, severe chronic nausea, major depressive disorder, and chronic fatigue.  [*Id.* at 3.]  Ms. DeLon's medical problems made it difficult for her to continue her ninety-minute commute to Lilly's Indianapolis office.  [*Id.*]  Beginning in 2006 or 2007, Ms. DeLon received approval to work from home, instead of from Lilly's Indianapolis office, all but three days every two weeks.  [*Id.* at 4.]  She performed her work successfully under this arrangement through 2009.  [*Id.* at 4-5.]  Between 2006 until her termination in 2010, Lilly approved several medical leaves of absence for Ms. DeLon, which ranged from a few days off per month to extended multi-month periods of full-time leave.  [Dkt. 68-2 at 3.]

Lilly employee Charlene Jones was Ms. DeLon's immediate supervisor in 2009.  [Dkt. 76-1 at 5.]  Ms. Jones supported Ms. DeLon working from home and gave her positive performance reviews.  [*Id.* at 5, 13.]  In September 2009, Ms. DeLon became aware that Lilly intended to eliminate its flex policy effective January 1, 2010, which affected Ms. DeLon's ability to work remotely as often as she did.  [*Id.* at 5.]  In light of this change, Ms. Jones recommended that Ms. DeLon consider Lilly's telecommute policy and secure the necessary approval to continue working from home under that policy.  [*Id.* at 5-6.]

Ms. DeLon consulted her primary physician, Dr. Timothy Gatewood, that September.  He recommended that, due to her various health issues, she work from home "at least four days per week for the next six months."  [*Id.* at 6.]  Although Ms. Jones was supportive of this arrangement, Ms. Jones' supervisor, Cathy Drook, "was resistant to the idea . . . but . . . did not provide a firm denial."  [*Id.*]  Ms. Jones informed Ms. DeLon that the ultimate decision would be made

- 3 -

by Ms. Drook, with input from Lilly's Employee Health Services ("EHS"), thus Ms. DeLon should communicate the bases for her request to EHS.  [*Id.*]  Ms. Jones did so, and her work performance during this period did not suffer, despite the additional stress the situation caused.  [*Id.* at 6-7.]  But in November 2009, Ms. Drook denied Ms. DeLon's request to continue working from home.  [*Id.* at 7.]

Because Ms. DeLon was going to have to report five days a week to Lilly's Indianapolis office beginning January 1, 2010, she applied for leave under Lilly's Illness Pay Plan ("IPP"). [*Id.*]  The IPP provides, in relevant part, that "[i]f a regular employee . . . is absent because of his or her own qualifying illness or injury, he or she may . . . receive full or partial pay."  [Dkt. 68-4 at 8.]  For employees such as Ms. DeLon who had worked at Lilly for over a year, the IPP provides them three months of full pay followed by three to twelve months of sixty-five percent pay, depending on their years of service.  [*Id.*]  Lilly granted Ms. DeLon's request and she began receiving IPP benefit payments.  Lilly extended Ms. DeLon's IPP leave on several occasions— ultimately through mid-May of that year—based on medical information she provided.  [Dkts. 76-1 at 7-8; 76-6 at 8.]  Ms. DeLon contacted Ms. Jones in mid-May to see if she could begin working from home several days each week.  [Dkt. 76-1 at 8.]  Although Ms. Jones continued to support the idea, Lilly would not permit Ms. DeLon to work from home.  [*Id.*]

Ms. DeLon continued to have her treating physicians update Lilly regarding her ability to return to work.  On May 27, 2010, Dr. Gatewood sent a letter to Lilly explaining his view of Ms. DeLon's ongoing medical difficulties and concluded that she "will be unable to work through September of 2010."  [Dkt. 76-2 at 12.]  Dr. Michelle Haendiges, another of Ms. DeLon's treating physicians, sent Lilly a letter on June 14, 2010, stating, "Due to the ongoing issues, treatment and adjustments to her medication [Ms. DeLon] will be unable to work through August 16,

2010." [*Id.* at 15.]   Despite the views of Ms. DeLon's physicians, Lilly determined that Ms. DeLon could return to work by June 17, 2010 because she no longer qualified for the IPP.  [Dkt. 76-1 at 9.]  That day she met with one of Lilly's in-house physicians, who reviewed the list of medications Ms. DeLon was prescribed and confirmed that she could return to work.  [Dkts. 68-1 at 14; 76-1 at 9.]

Lilly informed Ms. DeLon that if she did not report to work by noon on June 22, 2010, Lilly would consider her to have voluntarily resigned.  [Dkts. 68-1 at 10; 76-1 at 10.]  Ms. DeLon responded that, due to her medical conditions, she was "unable to return to work at this time," but declined to resign her position.  [Dkt. 76-3 at 18.]  After Ms. DeLon did not report to work as ordered, Lilly terminated her employment effective June 22, 2010.  [Dkt. 76-1 at 10.]

Ms. DeLon neither applied for nor received any benefits pursuant to Lilly's Extended Disability Plan ("EDP").  The EDP deems eligible any employee "whose active employment terminates because of Disability."  [Dkt. 68-6 at 28.]  The EDP explains, "An Employee who in-tends to file a claim for [EDP benefits] must notify the Employee Benefits Committee . . . in writing within 30 days from the date on which the Disability commences."  [*Id.* at 39.]  Should an employee qualify for EDP payments, the payment "shall commence as of the first day of the month immediately following the month in which such Employee's Disability Date occurs.  [*Id.* at 31.]  And an employee's "Disability Date" is the later occurring of (1) "the last day for which an Employee who is Disabled received pay under [the IPP]," or (2) "the date as of which the Employee Benefits Committee makes a final determination that the Employee is Disabled."  [*Id.* at 19.]  Thus, an employee cannot begin receiving EDP payments until after they have received full benefits under the IPP.  [*Id.*]

On March 31, 2011, Ms. DeLon filed a charge of discrimination against Lilly with the Equal Employment Opportunity Commission ("EEOC"), alleging that Lilly discriminated against her due to her disabilities.  [Dkt. 1-1.]  The EEOC dismissed the charge against Lilly.  [Dkt. 1-2.]  Ms. DeLon filed the instant suit in this Court on April 26, 2012, alleging that Lilly violated the ADA and ERISA.  [Dkt. 1.]  Lilly now moves for summary judgment on all of Ms. DeLon's claims.  [Dkt. 68.]

### III.
### DISCUSSION

The Court addresses each of Ms. DeLon's claims in turn, beginning with her ADA claims.

### A.      ADA Claims

Ms. DeLon contends that Lilly violated her rights under the ADA by failing to provide her with either of two accommodations—namely, its refusal "to allow [her] to continue working from home on a limited basis" and its failure to "extend [her] disability leave."  [Dkt. 77 at 18.]  Lilly maintains that any ADA claims relating to its actions prior to June 4, 2010, are time-barred and that, even if not, Ms. DeLon has not adduced evidence sufficient to prove the elements of her ADA claims.

### 1.      Ms. DeLon's ADA claims based on actions by Lilly taken prior to June 4, 2010, are time-barred

Lilly first contends that Ms. DeLon cannot maintain an ADA claim for any acts occurring prior to June 4, 2010, because such claims are time-barred.  [Dkt. 69 at 9.]  Notably, Ms. DeLon entirely ignores this argument, failing to even mention it in her response brief.  This lack of response is telling, as Lilly's position is clearly correct.

- 6 -

In Indiana, charges of discrimination "must be filed within 300 days of the occurrence of the act that is the basis of the complaint." *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 445 (7th Cir. 1994) (regarding a Title VII claim); *see Stepney v. Naperville Sch. Dist. 203*, 392 F.3d 236, 239 (7th Cir. 2004) ("Because the ADA's enforcement provision expressly incorporates § 2000e-5 of Title VII, claims for discrimination under the ADA also must be filed within 300 days 'after the alleged unlawful employment practice occurred.'") (quoting 42 U.S.C. § 2000e-5(e)(1). If a plaintiff does not file her charge within this window, "her claim is time-barred and [s]he may not recover." *Roney v. Ill. Dep't of Transp.*, 474 F.3d 455, 460 (7th Cir. 2007).

Ms. DeLon filed her EEOC charge on March 31, 2011. [Dkt. 1-1.] The three-hundredth day prior to March 31, 2011, is June 4, 2010. Thus any ADA claims based on "discrete acts" that occurred prior to June 4, 2010, are time-barred. *Roney*, 474 F.3d at 460. Importantly, re-fusal to provide a reasonable accommodation is a "discrete act." *See Teague v. Northwestern Mem'l Hosp.*, 492 Fed. Appx. 680, 684 (7th Cir. 2012) (holding this and citing other circuits that have held the same). Thus Ms. DeLon's claims based on any alleged refusals prior to June 4, 2010, are time-barred.

According to Ms. DeLon, Lilly informed her that she would not be permitted to continue working from home in November 2009. [Dkt. 76-1 at 7.] In January 2010, Dr. Robert Blake recommended that Lilly permit Ms. DeLon to work from home, but Ms. DeLon attests that "Lilly did not offer [her that] opportunity." [*Id.* at 8.] Because Lilly's rejection of these requests oc-curred prior to June 4, 2010, any ADA claims Ms. DeLon seeks to advance on the basis of these rejections are time-barred. *See Roney*, 474 F.3d at 460.

However, Ms. DeLon again requested permission to work from home in "mid-May" 2010. [Dkt. 76-1 at 8.] Neither Lilly nor Ms. DeLon identifies the date this request was denied,

only that it was, making it impossible to determine whether this request is also time-barred.  Because the Court ultimately determines that Ms. DeLon's claim based on Lilly's rejection of her request to work from home fails on the merits, the Court proceeds as if this final request was rejected after June 4, 2010, and thus is not time-barred.

### 2.   Ms. DeLon has produced insufficient evidence to prove either of her ADA claims

Ms. DeLon contends that Lilly violated her ADA rights by failing to provide her with either of two reasonable accommodations: the ability to work from home or a leave of absence. [Dkt. 77 at 18.]  To prevail on such claims, Ms. DeLon must show that "(1) she is disabled; (2) she is otherwise qualified to perform the essential functions of her job with or without reasonable accommodation; and (3) her employer took an adverse job action against her because of her disability or without making a reasonable accommodation for it."  *Basden v. Professional Transp., Inc.*, 714 F.3d 1034, 1037 (7th Cir. 2013).  These factors are "examined as of the time of the adverse employment decision at issue."  *Id.*

The parties do not dispute that Ms. DeLon is disabled.  However, Lilly argues that summary judgment on Ms. DeLon's ADA claims is warranted because the evidence demonstrates that she is not a "qualified individual" under the ADA, [dkt. 69 at 10-11], which is to say that, at the relevant time, she was not qualified to "perform the essential functions of the job either with or without reasonable accommodation," *Majors v. General Elec. Co.*, 714 F.3d 527, 533 (7th Cir. 2013) (citing 42 U.S.C. § 12111(8)).  Furthermore, Lilly contends Ms. DeLon requested a lengthy and indefinite leave of absence, and that such a request does not constitute a *reasonable* accommodation.  [Dkt. 69 at 13-14.]

Ms. DeLon responds that she adduced sufficient evidence that with a reasonable accommodation—either "allow[ing] her to work from home or extend the disability leave so that [she]

could recover and return to job"—she could perform the essential functions of her job and thus was a qualified individual under the ADA. [Dkt. 77 at 19-20.] Moreover, contrary to Lilly's position that Ms. DeLon requested a lengthy, indefinite leave of absence, she contends that she requested permission to continue to work from home or receive a month-and-a-half leave of absence. [*Id.* at 20-29.] The Court will address each of Ms. DeLon's asserted accommodations in turn.

### a.     Request to Work from Home

The Court begins with the parties' dispute over Ms. DeLon's request for permission to work from home. Ms. DeLon argues that when Lilly terminated her employment she could have performed "all of the essential functions of her job with the reasonable accommodation. Namely, when Lilly accommodated her disability and allowed [her] to work from home from 2006 through November 2009." [Dkt. 77 at 20.] However, the evidence demonstrates that, even if this requested was granted, Ms. DeLon could still not perform the essential functions of her job, which precludes her from proving that she is a "qualified individual" under the ADA.

Ms. DeLon attests in her declaration filed in opposition to Lilly's motion that she could have performed the essential functions of her job in June 2010 had she been allowed to work from home. [Dkt. 76-1 at 11.] However, her prior deposition testimony directly contradicts that assertion. She provided the following answers to questions posed by Lilly's counsel:

Q.     Okay. At that time in June 2010 when you were being evaluated for continued illness pay, were you able to do any work at all?

A.     Not during that time.

Q.     Anywhere?

A.     No. I was so sick as a dog. . . .

[Dkt. 68-1 at 9.]

"When a conflict arises between a plaintiff's sworn testimony and a later affidavit or declaration, the 'affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy.'" *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 759 (7th Cir. 2006) (quoting *Piscione v. Ernst & Young, LLP*, 171 F.3d 527, 532-33 (7th Cir. 1999)); *see also Velez v. City of Chicago*, 442 F.3d 1043, 1049 (7th Cir. 2006).  Ms. DeLon's deposition testimony could not be more clear that, at the time Lilly decided to terminate her employment, Ms. DeLon could not work *at all*—whether from home or otherwise.  [Dkt. 68-1 at 9.]  This directly belies her subsequent statements that, had she been permitted to work from home, she could have performed the essential functions of her job.[1]  Because the Court must treat Ms. DeLon's deposition testimony as controlling over contradictory declaration statements, and this testimony establishes that working from home would not have allowed Ms. DeLon to perform the essential functions of her job, she is unable to establish the second element of her ADA claim.[2]  *See Majors*, 714 F.3d at 533.

### b.      Request to Extend the IPP Leave of Absence

---

[1] Although Ms. DeLon attempts to explain this discrepancy in her declaration, [dkt. 76-1 at 8], she did not argue in her opposition brief that the articulated exceptions to this rule apply or otherwise point the Court to the explanations provided in her declaration.  The Court therefore need not address whether the exceptions apply.  *See Pourghoraishi*, 449 F.3d at 759 (concluding that affidavit statements that contradict the party's deposition testimony must be disregarded since the party "has not asserted that either of the[] [exceptions] applies to his deposition testimony").

[2] Because the evidence demonstrates that even with her requested accommodation, Ms. DeLon could not have performed the essential functions of her job, the Court need not decide whether, under the circumstances of this case, such a request is a reasonable one.  Assuming that it is, Ms. DeLon still could not prove that the accommodation would allow her to perform the essential functions of her job.

Ms. DeLon's deposition testimony makes it clear that she could not perform the essential functions of her job in June 2010. This leaves her contention that she could have performed those functions in the future, had Lilly granted her request to extend her leave of absence. Lilly contends that Ms. DeLon's request for "lengthy and open-ended leave is not a reasonable form of accommodation," and thus she cannot rely on it to establish the second element of her ADA claim. [Dkt. 88 at 7.] Ms. DeLon maintains that a leave of absence can be reasonable under certain circumstances and that it was under the circumstances of this case. [Dkt. 77 at 26-29.] Specifically, Ms. DeLon maintains that her "absence was predictable," as she "was not requesting the unfettered ability to leave work at any time," and that Dr. Haendiges informed Lilly that on August 16, 2010, "Ms. DeLon would likely be able to return to work." [*Id.* at 27.] Relying heavily on the district court decision in *EEOC v. Midwest Indep. Transmission Systems Operator, Inc.*, 2013 WL 2389856 (S.D. Ind. 2013), Ms. DeLon argues that her evidence is sufficient to create a fact issue as to whether her request for leave was reasonable. [Dkt. 77 at 19-20, 28-29.]

Relevant authority provides that "whether a requested accommodation is reasonable or not is a highly fact-specific inquiry and requires balancing the needs of the parties." *Rauen v. U.S. Tobacco Mfg. Ltd. P'ship*, 319 F.3d 891, 896 (7th Cir. 2003) (quoting *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 784 (7th Cir. 2002)). But the Seventh Circuit has also stated, rather categorically, that the "[i]nability to work for a multi-month period" precludes a person from establishing that they are a qualified individual under the ADA. *Byrne v. Avon Prods., Inc.*, 328 F.3d 379, 381 (7th Cir. 2003).

Lilly, however, does not take the position that *Byrne* created a *per se* rule that a multi-month leave of absence is never a reasonable accommodation. [Dkt. 88 at 7.] Instead, Lilly maintains that lengthy, *open-ended* leave that is not reasonable. Ms. DeLon seems to agree with

the latter position.[3]  [Dkt. 77 at 26 ("*If an end date is proposed*, whether the leave is too long to constitute a reasonable accommodation is a fact issue.") (emphasis added).]   And most importantly, there is Seventh Circuit case law to this effect.

It is well-established that "no business is 'obligated to tolerate erratic, unreliable attendance.'"  *EEOC v. Yellow Freight Sys., Inc.*, 253 F.3d 943, 949 (7th Cir. 2001) (en banc) (quoting *Waggoner v. Olin Corp.*, 169 F.3d 481, 485 (7th Cir. 1999)).  An employee's request for a long-term, indefinite leave of absence falls within this rule; if the leave requested does not have a definitive end date, the employee's attendance (or lack thereof) is most certainly characterized as unreliable.  *See Oestringer v. Dillard Store Servs., Inc.*, 92 Fed. Appx. 339, 342 (7th Cir. 2004) ("[Plaintiff's] extended absence—*which had no definite endpoint*—shows that she was not a qualified individual when [her employer] terminated her employment because she could not attend work.") (emphasis added) (quotation marks omitted); *see also Basden*, 714 F.3d at 1038 ("[Plaintiff's] evidence that medication improved her condition; that she had *hoped* for enough improvement to return to work regularly after leave; and that she subsequently had brief employment that was interrupted by a two-week absence caused by her condition . . . was insufficient to support a factual finding that . . . her regular attendance could have been expected following the leave she sought or with any other accommodation.") (emphasis added).

---

[3] The Court recognizes that at least one Judge in this District has stated that the admittedly "unequivocal" assertion in *Byrne* that the inability to work for a multi-month period is not a reasonable accommodation should not be interpreted as a categorical rule given the fact-specific inquiry required to determine whether a requested accommodation is reasonable.  *Midwest Ind. Transmission Sys. Operator*, 2013 WL 2389856, at *4.  However, given Lilly's reticence to rely on *Byrne* as establishing a concrete rule, and Ms. DeLon's agreement that lengthy, open-ended leave is not a reasonable accommodation, the Court does not rely exclusively on *Byrne* to conclude that summary judgment in favor of Lilly is warranted.

Despite Ms. DeLon's assertions that her requested absence (from approximately mid-June to mid-August) was reasonable because it was "predictable" and not "indefinite," the evidence on which she relies to establish this proves otherwise.  [Dkt. 77 at 27-28.]  Ms. DeLon specifically cites Dr. Haendiges' June 14, 2010, letter as "provid[ing] a clear prospect for recovery and return to work."  [Dkt. 77  at 28.]

But Dr. Haendiges' letter does no such thing.  After explaining Ms. DeLon's health issues and the difficulties they caused her, Dr. Haendiges stated in relevant part: "The patient will require ongoing follow up for the above mentioned.  It typically can take 2 months or longer to establish hormonal balance.  Due to the ongoing issues, treatment and adjustments to her medications she will be unable to work through August 16, 2010."  [Dkt. 76-2 at 15.]  Far from providing a clear prospect that Ms. DeLon will be able to return to work, Dr. Haendiges' letter provides only the time during which Ms. DeLon cannot work, without attesting one way or another regarding a return date.  [*Id.*]

Ms. DeLon's focus on Dr. Haendiges' letter is understandable, given that Dr. Gatewood's letter is even worse for her position.  Dr. Gatewood provided his letter to Lilly on May 27, 2010—meaning Lilly received this letter well before Dr. Haendiges' June 14, 2010, letter—and it suggests that Ms. DeLon would need a significantly longer and indefinite leave of absence.  After setting forth his view of Ms. DeLon's health problems, Dr. Gatewood stated in relevant part: "In total, due to [Ms. DeLon's] . . . ongoing medical issues, [she] has been unable to work in recent months; this continues to be the case. . . .  As noted due to these ongoing issues, treatment, and medications with multiple side effects the patient will be unable to work through September 2010."  [*Id.* at 12.]

Contrary to Ms. DeLon's position, neither of her physicians provided "a clear prospect for recovery and return to work." [Dkt. 77 at 28.] Both letters provide that Ms. DeLon cannot work for a significant period of time, and neither explicitly state that she will be able to return to work following that significant period. [Dkts. 76-2 at 15 ("It typically can take *2 months or longer* to establish hormonal balance.") (emphasis added); *id.* at 12 ("[Ms. DeLon] will be unable to work through September 2010.").]

To the extent that the letters, viewed in the light most favorable to Ms. DeLon, could be read to suggest that Ms. DeLon would be able to return to work on the dates provided, Ms. DeLon's deposition testimony regarding these letters precludes such a reading. Indeed, she testified that her physicians at most *hoped* that her treatment would allow her to return to work after multiple months off, but there was no certainty in this regard:

> Q.  At that point was there -- your doctors took you off work, one through August, one through September. Was there any assurance that with that additional time off work you would be able to resume doing all your job duties?
>
> A.  No assurance other than Dr. Haendiges was very positive thinking on my prognosis and she really believed that she was going to get to the root of it and that I would start feeling better with her treatment, so.
>
>     . . . .
>
> Q.  Okay. So it was at least that long and then we hope there might be a return, but don't know.
>
> A.  Yes.
>
> Q.  But you weren't able to do any work, and you didn't know if you would at any time in the foreseeable future be able to?
>
> A.   I didn't know at that time, no.

[Dkt. 68-1 at 10.] Ms. DeLon's hope that she would be able to return is insufficient to make her requested leave of absence a reasonable one. *See Basden*, 714 F.3d at 1038 (recognizing that

plaintiff's "*hope*[] for enough improvement to return to work regularly after leave . . . was insufficient to support a factual finding that . . . her regular attendance could have been expected following the leave she sought or with any other accommodation") (emphasis added).

The evidence demonstrates that Ms. DeLon requested an extended leave of absence of at least approximately two months, which the Seventh Circuit has held "removes her from the class protected by the ADA." *Byrne*, 328 F.3d at 381.  But, as stated above, the Court need not rest its conclusion solely on *Byrne*.  Even if Ms. DeLon's requested absence was not too lengthy to be unreasonable, its indefiniteness rendered it so, as the request for an "extended absence—*which had no definite endpoint*—shows that [Ms. DeLon] was not a qualified individual."[4]  *Oestringer*, 92 Fed. Appx. at 342 (emphasis added).  Accordingly, for the reasons stated, the Court concludes that summary judgment in favor of Lilly on Ms. DeLon's ADA claims is warranted.[5]

In sum, the Court concludes that Ms. DeLon did not present sufficient evidence that she was a qualified individual.  Ms. DeLon's own testimony establishes that she could not have performed the essential functions of her job even if Lilly permitted her to work from home at the

---

[4] Ms. DeLon also contends that Lilly failed to engage in the "interactive process" mandated by the ADA.  [Dkt. 77 at 24-25.]  "However, the failure to engage in the interactive process required by the ADA is not an independent basis for liability . . . , and that failure is actionable only if it prevents identification of an appropriate accommodation for a qualified individual."  *Basden*, 714 F.3d at 1039.  Therefore, "[e]ven if an employer fails to engage in the required process, that failure need not be considered if the employee fails to present evidence sufficient to reach the jury on the question of whether she was able to perform the essential functions of her job with an accommodation."  *Id.*  As discussed above, Ms. DeLon did not present such evidence.  Thus, Lilly's alleged failure to engage in the interactive process does not preclude summary judgment in its favor.

[5] Ms. DeLon points to a June 2010 news article reporting that Lilly terminated the employment of nineteen employees in its communications department as evidence supporting her ADA claim.  [Dkt. 77 at 17.]  But this is not evidence that Lilly terminated Ms. DeLon "because of her disability or without making a reasonable accommodation for it," *Basden*, 714 F.3d at 1037, and thus is irrelevant to whether summary judgment is proper.  Further as Lilly notes, the article is not properly before the Court as it was not disclosed in discovery and is not admissible evidence.

relevant time.  And as to the requested leave of absence, the evidence demonstrates that Ms. DeLon requested a lengthy leave of absence with no definitive return date; such an accommodation is not a reasonable one.  Accordingly, summary judgment in Lilly's favor on Ms. DeLon's ADA claims is warranted.

### B.    ERISA Claims

Ms. DeLon also brings claims under ERISA, arguing that she is due benefits under Lilly's IPP and EDP.  The Court addresses each ERISA claim in turn.

### 1.    IPP

Ms. DeLon brings an ERISA claim seeking to recover benefits allegedly due to her under Lilly's IPP.  [*See* dkt. 77 at 29.]  Lilly seeks summary judgment on this claim, contending that Ms. DeLon cannot seek benefits allegedly due under the IPP via an ERISA claim because the IPP is not an "employee welfare benefit plan" and thus is not covered by ERISA.  [Dkt. 69 at 15.]  Specifically, Lilly contends that its IPP is a "payroll practice" and a Department of Labor regulation, 29 C.F.R. § 2510.3-1(b), excludes such payroll practices from the definition of an "employee welfare benefit plan."  [*Id.*]  Ms. DeLon responds that the IPP does not meet the definition of "payroll practice" under the regulation, rendering it inapplicable.  [Dkt. 77 at 31.]  Furthermore, Ms. DeLon contends that the IPP and the EDP—which Lilly acknowledges is an ERISA plan—constitute a unitary ERISA plan.  [Dkt. 77 at 31-34.]

The provisions of ERISA govern, among other things, any "employee welfare benefit plan," *Massachusetts v. Morash*, 490 U.S. 107, 113 (1989), which is defined in relevant part as "any plan, fund, or program . . . to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits

in the event of sickness, accident, [or] disability . . . ."  29 U.S.C. § 1002(1).  ERISA specifically authorizes the Secretary of Labor to "prescribe such regulations . . . necessary or appropriate to carry out the provisions of this subchapter," 29 U.S.C. § 1135, and the Court gives deference to the Secretary's "reasonable views," *Morash*, 490 U.S. at 116 (citing *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984)).

One such regulation provides that "[p]ayroll practices" are not "employee welfare benefit plan[s]."  29 C.F.R. § 2510.3-1(b).  The regulation defines payroll practices, in pertinent part, as "[p]ayment of an employee's normal compensation, out of the employer's general assets, on account of periods of time during which the employee is physically or mentally unable to perform his or her duties, or is otherwise absent for medical reasons . . . ."  29 C.F.R. § 2510.3-1(b)(2). If, as Lilly contends, the IPP constitutes a payroll practice under this regulation, it is not an ERISA plan.  *See id.*; *see also Sullivan v. CUNA Mut. Ins. Soc'y*, 649 F.3d 553, 557 (7th Cir. 2011) (recognizing that 29 C.F.R. § 2510.3-1(b)(2) defines "those fringe benefits that are not treated as ERISA plans"); *Bickel v. Liberty Mut. Group, Inc.*, 2010 WL 4923035, *2 (S.D. Ind. 2010) ("[I]f the . . . Plan satisfies the regulation's definition of an excluded payroll practice it is not subject to ERISA.").

Lilly argues that the IPP falls squarely within the definition of payroll practices set forth in the regulation.  [Dkt. 69 at 16-17.]  The IPP provides, in relevant part, that "[i]f a regular employee . . . is absent because of his or her own qualifying illness or injury, he or she may . . . receive full or partial pay."  [Dkt. 68-4 at 8.]  For employees having worked at Lilly for over a year, the IPP provides them three months of full pay followed by three to twelve months of sixty-five percent pay, depending on their years of service.  [*Id.*]  This, says Lilly, in conjunction with Lilly's evidence that IPP payments are made from Lilly's general assets, [dkt. 68-5 at 2], conclu-

sively demonstrates that the IPP is a payroll practice excluded from ERISA coverage, [dkt. 69 at 16-17]. At the threshold, this evidence seems to vindicate Lilly's position that the IPP is a payroll practice under 29 C.F.R. § 2510.3-1(b) that is not covered by ERISA. Under the IPP, Lilly makes payments from its general assets to account for time in which its employees cannot work for medical reasons.

Ms. DeLon offers little in response regarding the applicability of the payroll practice regulation. She does not contest Lilly's evidence that IPP payment are made from Lilly's general assets, nor assert that the Court should not follow the Department of Labor's regulation. Instead, her sole argument is that the IPP "deviates from the . . . regulation" because it does not pay employees "normal compensation." [Dkt. 77 at 31.] Because the IPP only provides sixty-five percent pay after the initial three months, says Ms. DeLon, employees do not receive "normal compensation" under the IPP as required by the regulation. [*Id.*] As Lilly points out, however, Ms. DeLon "does not mention, much less attempt to refute," the case cited by Lilly, *Monkhouse v. Stanley Assocs., Inc. Short Term Disability Plan for Emps. of Stanley Assocs., Inc.*, 2010 WL 1692450, *3 (S.D. Tex. 2010), which held that "paying less than full salary does not turn a payroll practice into an ERISA plan." [Dkt. 88 at 13.] Lilly is correct; in arguing that the IPP does not pay "normal compensation" as required by the regulation, not only does Ms. DeLon ignore the authority cited by Lilly in its opening brief, but she cites no authority supporting her position that 65% of an employee's pay does not constitute "normal compensation." [*See* dkt. 77 at 31.] This is perhaps because the courts that have addressed this question have uniformly decided that such an arrangement constitutes "normal compensation."

The Ninth Circuit addressed this exact question in *Bassiri v. Xerox Corp.*, 463 F.3d 927 (9th Cir. 2006), and, in a well-reasoned and lengthy treatment of the issue, ultimately held that a

company's long-term disability plan that paid sixty percent of an employee's regular salary constituted payment of "normal compensation" under the regulation and that the plan was thus a payroll practice rather than an ERISA plan.  *See id.* at 930-33.  The Ninth Circuit reached this conclusion after determining that it owed deference to the Department of Labor's view—consistently expressed in eleven Department of Labor opinion letters over a fifteen-year period—that the payment of less than one's full salary could constitute "normal compensation."  *Id.* at 930; *see, e.g.*, Department of Labor Opinion Letter 93-02A, 1993 WL 68525, *2 (Jan. 12, 1993) ("It is the position of the Department that an employer's payment of less than normal compensation from the employer's general assets during periods in which an employee is absent for medical reasons may constitute a payroll practice that is not [a]n employee welfare benefit plan.").  It also noted that every other court "that has explicitly considered" the question has reached the same conclusion.  *Bassiri*, 463 F.3d at 933 n.2.  Other district courts, both in this circuit and across the country, have indeed reached the same conclusion.  *See Street v. Ingalls Mem'l Hosp.*, 2007 WL 844619, *3-4 (N.D. Ill. 2007) (granting *Auer-Seminole Rock* deference "to the DOL's advisory opinion that an employer's payment of 60% of an employee's salary meets the payroll practice exemption"); *Havey v. Tenneco, Inc.*, 2000 WL 198445, *8 (N.D. Ill. 2000) ("Payments of less than full compensation still fall within [the payroll practice] exception and case law upholds this rule."); *Hite v. Biomet, Inc.*, 38 F.Supp.2d 720, 729-30 (N.D. Ind. 1999) (relying on the Department of Labor opinion letters in concluding that "normal compensation" includes amounts less than the employee's full pay); *see also Monkhouse*, 2010 WL 1692450, at *3 (holding that the employer's short-term disability plan that paid qualifying employees sixty percent of their wages during the time of disability falls "squarely" within § 2510.3-1(b)(2) because it "satisfies the requirement that Defendant must pay Plaintiff's 'normal compensation' as the benefit;

the Department of Labor interprets 'normal compensation' in § 2510.3-1(b)(2) to include payments of less than full salary" and collecting cases); *Butler v. Bank of America*, 2008 WL 1848426, *2 (N.D. Tex. 2008) (holding the same and collecting cases).[6]

The Court is persuaded by these authorities. Instead of confronting the authority cited by Lilly regarding the payroll practice regulation, Ms. DeLon diverts the Court to the Supreme Court's statement in *Fort Halifax Packing Co., Inc. v. Coyne*, 482 U.S. 1 (1987), that Congress intended ERISA to cover "benefits whose provision by nature requires an ongoing administrative program to meet the employer's obligation." *Id.* at 12. The Supreme Court went on to ultimately hold that the Maine statute at issue in that case could not possibly constitute an ERISA plan because it was a far cry from an administrative program. *Id.* ("The Maine statute neither establishes, nor requires an employer to maintain, an employee benefit plan. The requirement of a one-time, lump-sum payment triggered by a single event requires no administrative scheme whatsoever to meet the employer's obligation."). Nevertheless, Ms. DeLon argues as if *Fort Halifax* held that the converse is true—namely, that any administrative scheme is an ERISA plan. Specifically, Ms. DeLon relies solely on *Fort Halifax* and the various administrative procedures required under the IPP in contending that, because the IPP "requires extensive administrative practices [it] goes far beyond a payroll practice." [Dkt. 77 at 32.]

---

[6] "Under *Auer-Seminole Rock* deference, an agency's interpretation of its own validly issued regulation"—such as those provided in the Department of Labor opinion letters—"is 'controlling . . . unless it is plainly erroneous or inconsistent with the regulation.'" *Exelon Generation Co., LLC v. Local 15 Int'l Brothers of Elec. Workers ALF-CIO*, 676 F.3d 566, 576 (7th Cir. 2012) (quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997)). Ms. DeLon at best insinuates—but certainly does not present a reasoned argument with authorities—that the regulation is unreasonable and thus not entitled to deference or that any of the exceptions to *Auer-Seminole Rock* deference apply. *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166 (2012) (setting forth the exceptions). To the extent that Ms. DeLon attempts to raise such an argument, the Court rejects it and agrees with the authority cited herein that has found the Department of Labor's interpretation of its own regulation to be a reasonable one.

- 20 -

But Ms. DeLon's focus on *Fort Halifax* is misguided.  As Lilly points out, following *Fort Halifax*, the Supreme Court in *Morash* deferred to the Department of Labor regulation at issue in this case—albeit a different subsection of it—that excludes certain payroll practices from being classified as ERISA plans.  *See Morash*, 490 U.S. at 113-19.  It did so without examining the breadth of the administrative scheme at issue, and instead focused on the payroll practice regulation.  This is the approach the Court takes here.  And, as described in detail above, Lilly persuasively demonstrates that the IPP is such a payroll practice.  Therefore, Ms. DeLon's reliance on *Fort Halifax* is misplaced and fails to undermine Lilly's persuasive point—that the Department of Labor regulations define programs such as the IPP as payroll practice that are not governed by ERISA In light of this, the Court concludes that Lilly's IPP constitutes a "payroll practice" under 29 C.F.R. § 2510.3-1(b)(2) because it pays Ms. DeLon normal compensation out of Lilly's general assets for periods of time she cannot work due to her medical conditions.[7]  *See Langley v. DaimlerChrysler Corp.*, 502 F.3d 475, 479 (6th Cir. 2007) ("[The plaintiff] does not dispute that [the defendant] made [the disability] payments entirely out of its general assets.  Nor does she

---

[7] Ms. DeLon relies on two cases from the Fifth Circuit to argue that, "[b]ecause of the functional integration of the [IPP] and [EDP], they should be considered a single plan and not one payroll practice and one ERISA plan."  [Dkt. 77 at 33-34 (citing *Crowell v. Shell Oil Co.*, 541 F.3d 295, 305 (5th Cir. 2008); *House v. Am. United Life Ins. Co.*, 499 F.3d 443, 448 (5th Cir. 2007)).]  Neither of those cases even involves the payroll practice regulation at issue in this case, which drives the Court's ultimate conclusion.  Moreover, as Lilly explains, the IPP and EDP do not overlap in the same manner the plans at issue in the Fifth Circuit cases do.  [Dkt. 88 at 14-16.]  For example, the Fifth Circuit in *Crowell* held that a cash payment was part of the broader ERISA plan because the "payment is embedded within a letter that includes [the] more comprehensive" ERISA plan.  *Crowell*, 541 F.3d at 305.  The IPP, however, is not in any way "embedded" in the EDP.  Ms. DeLon makes much of the fact that a Lilly employee is not eligible for EDP benefits until she has fully exhausted her IPP benefits.  [Dkt. 77 at 33.]  While this much is true, as explained in detail below, it does not make the IPP and EDP a single ERISA plan.  As Lilly asserts, it merely reflects that the IPP and EDP are "designed so that they don't pay benefits for the same period of absence."  [Dkt. 88 at 14.]  The Fifth Circuit cases do not speak to this situation, and Ms. DeLon cites no authority supporting her position that such a design would render the IPP and EDP a single ERISA plan.

assert that recipients received anything other than 'normal' compensation under the plan.  Accordingly, [the defendant's disability plan] falls squarely within the plain meaning of a payroll practice."); *Stern v. Int'l Busi. Mach. Corp.*, 326 F.3d 1367, 1372 (11th Cir. 2003) ("The IBM Program fits within the express terms of the Secretary's payroll practices regulation.  It pays out of IBM's general assets an employee's normal compensation during periods when the employee is physically or mentally unable to work.").  Because the IPP is not an ERISA plan, this Court does not have jurisdiction to hear Ms. DeLon's ERISA claim.  *See Adono v. Wellhausen Landscape Co.*, 258 Fed. Appx. 12, 15 (7th Cir. 2007) ("[I]f there were no plan under ERISA, [the Court] would not have subject matter jurisdiction to hear [plaintiffs'] claims."); *UIU Severance Pay Trust Fund v. Local Union No. 18-U, United Steelworkers*, 998 F.2d 509, 510 n.2 (7th Cir. 1993) ("[T]he existence of an ERISA-governed plan is an essential precursor to federal jurisdiction.") (quotation marks omitted).

### 2.    EDP

Unlike the IPP, Lilly concedes that its EDP is an ERISA plan.  [Dkt. 69 at 17.]  Lilly, however, maintains that Ms. DeLon did not properly exhaust the administrative remedies set forth in the EDP, which precludes judicial review of Ms. DeLon's ERISA claim.  [*Id.* at 17-19.]

Ms. DeLon responds that she was not required to exhaust the EDP's administrative procedures because "she was never eligible to apply for [EDP] benefits."  [Dkt. 77 at 34 (capitalization altered).]  She further explains: "[A]t the time of her termination, the benefits that she was denied were [IPP] benefits. . . . She had not yet become eligible for [EDP] benefits . . . .  To be eligible for benefits under the [EDP], [she] (1) had to be an employee and (2) had to have exhausted her [IPP] benefits," which she had not yet done.  [*Id.* at 34-35.]  According to Ms. DeLon, she became ineligible for EDP benefits when her employment was terminated "because

Section 3.03(a) of the [EDP] provides that 'An Employee's eligibility to participate in the Plan shall terminate on the earlier of (i) the date on which he ceases to be an Employee or (ii) the date on which the Plan terminates." [*Id.* at 35.]

Lilly replies that Ms. DeLon misconstrues the EDP. [Dkt. 88 at 16-17.] Lilly recognizes that Section 3.03(a) sets forth an employee's "eligibility to participate in the Plan," but argues that Ms. DeLon "wrongly equates an individual's plan 'participation' . . . to the disability period for receiving Plan benefits." [*Id.* at 16.] Simply put, Lilly argues that eligibility for the EDP triggers "the moment the disability is incurred," rather than "at benefit commencement, [which] usually [begins] after many months away from the workplace." [*Id.* at 17.] Thus, Lilly argues, because Ms. DeLon could have filed an EDP claim at the commencement of her disability but did not, she did not exhaust her administrative remedies under the EDP as is required to bring an ERISA claim. [*Id.*]

The Seventh Circuit has "interpreted ERISA as requiring exhaustion of administrative remedies as a prerequisite to bringing suit under the statute." *Schorsch v. Reliance Standard Life Ins. Co.*, 693 F.3d 734, 739 (7th Cir. 2012) (citation and quotation marks omitted). Ms. DeLon does not contest that exhaustion is generally required under ERISA. Nor does she contest that Lilly's EDP requires claimants to file a written claim before obtaining EDP benefits, [dkt. 68-6 at 48 ("If you intend to file a claim for disability benefits under the plan, you must notify the employee benefits committee in writing within 30 days after the date you become disabled.")], and that she did not file such a claim, [dkt. 68-1 at 11 (admitting in her deposition testimony that she did not make a claim for benefits under the EDP)].

As detailed above, Ms. DeLon instead argues that she could not have filed an EDP claim because she had yet to receive her full IPP benefits and her employment was terminated before

she did.  [Dkt. 77 at 34-35.]  Although not specifically articulated as such, the Court discerns that Ms. DeLon is essentially arguing that her lack of exhaustion should be excused because of the well-recognized exception to the exhaustion requirement for instances where the potential claimant lacks "meaningful access to review procedures."  *Schorsch*, 693 F.3d at 739 (citation and quotation marks omitted).

The problem with Ms. DeLon's position—as Lilly points out—is that she could have filed an EDP claim at the commencement of her disability regardless of whether her IPP benefits had run out.  This is because, as Charles Grandy, Lilly's Counsel for Human Resources, [dkt. 68-5 at 2], explained in his deposition, "[i]f the person were deemed disabled during employment, while they couldn't start [EDP] benefits until the end of the [IPP] period, they could perhaps be found to be eligible for benefits under the [EDP]," [*id.* at 8].  The terms of Lilly's EDP bear this out.  The EDP describes an employee's "Eligibility for [EDP] Benefit" as an "eligible employee whose active employment terminates because of Disability."  [*Id.* at 28.]  As for applying for EDP benefits, it explains, "An Employee who intends to file a claim for [EDP benefits] must notify the Employee Benefits Committee . . . in writing within 30 days from the date on which the Disability commences."  [*Id.* at 39.]  And "90 days after the expiration of the 30-day period," the employee "must provide the Employee Benefits Committee with proof of the Employee's entitlement to [EDP benefits]."  [*Id.*]  The application requirements for EDP benefits are such even though the EDP payments may not begin until much later, and certainly will not begin until an employee has received all eligible payments under the IPP.  [*Id.* at 19, 31.][8]

---

[8] As explained above, should an employee qualify for EDP payments, the payments "shall commence as of the first day of the month immediately following the month in which such Employee's Disability Date occurs."  [Dkt. 68-6 at 31.]  And an employee's "Disability Date" is the later occurring of (1) "the last day for which an Employee who is Disabled received pay under [the

Simply put, there is nothing in the EDP that precluded Ms. DeLon from applying for EDP benefits while she is receiving IPP benefits; the EDP simply precludes EDP benefit payments from *commencing* until IPP benefits cease.  Therefore, although Ms. DeLon could not receive EDP benefit payments until after she had received all of the IPP payments for which we was eligible, she still could have noticed her intent to apply for EDP benefits as early as the onset of her disability.  Indeed, the time during which she could apply for EDP benefits began to run at the commencement of her disability.  [*Id.* at 39.]  Because she did not do so as required by the EDP, she has failed to exhaust her administrative remedies, which is a "prerequisite to bringing suit under [ERISA]."  *Schorsch*, 693 F.3d at 739.  Accordingly, Lilly is entitled to summary judgment on Ms. DeLon's ERISA claim for allegedly due EDP benefits.

## IV.
### CONCLUSION

For the reasons explained, the Court **GRANTS** Lilly's Motion for Summary Judgment. [Dkt. 68.]  Final judgment will issue accordingly.

12/31/2013

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

---

IPP]," or (2) "the date as of which the Employee Benefits Committee makes a final determination that the Employee is Disabled."  [*Id.* at 19.]  This is why—although the employee must provide written notice of her intent to apply for EDP benefits within thirty days "from the date on which Disability commences," [*id.* at 39]—the employee will not begin receiving EDP payments until after payment under the IPP have ceased, [*id.* at 19].

**<u>Distribution via ECF:</u>**

John W. Purcell
BAKER & DANIELS - Indianapolis
john.purcell@FaegreBD.com

Ellen E. Boshkoff
FAEGRE BAKER DANIELS LLP - Indianapolis
ellen.boshkoff@faegrebd.com

Ryann E. Ricchio
FAEGRE BAKER DANIELS LLP - Indianapolis
ryann.ricchio@faegrebd.com

Quincy Erica Sauer
MACEY SWANSON & ALLMAN
qsauer@maceylaw.com

Barry A. Macey
MACEY SWANSON AND ALLMAN
bmacey@maceylaw.com